**Margaret J. HOLDEN, et al.**

v.

**BURLINGTON NORTHERN, INC., et al.**

**Civ. No. 4–81–622.**

United States District Court, D. Minnesota, Fourth Division.

June 24, 1987.

**1400**

Paul C. Sprenger, Eric L. Olson, Robert L. Shutes, Sprenger, Olson & Shutes, P.A., Minneapolis, Minn., and Bridget Arimond, Terri Finesmith Horwich, Charles Barnhill, Jr., Davis, Barnhill & Galland, P.C., Chicago, Ill., for plaintiffs.

John D. Sargent, Barbara K. Besser, Debra L. Sharp, E.E.O.C., Cleveland Dist. Office, Cleveland, Ohio, for E.E.O.C.

Thomas P. Kane, Wayne G. Faris, Bradley G. Clary, Michael B. Chase, David G. Seykora, Laurie A. Zenner, Jeanne M. Gode, Jacqueline A. Shubatt, Scott C. Phifer, Oppenheimer, Wolff & Donnelly, Saint Paul, Minn., and Barry McGrath, Burlington Northern, Inc., Saint Paul, Minn., for railroad defendants.

Richard H. Kraushaar, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio and Robert V. Atmore, Lindquist & Vennum, Minneapolis, Minn., for Brotherhood of Locomotive Engineers and the R.R. Yardmasters of America.

Richard A. Williams, Jr., Hvass, Weisman & King, Minneapolis, Minn., and Louis P. Malone, III, Brotherhood of Maintenance of Way Employees, Washington, D.C., for the Brotherhood of Maintenance of Way Employees, AFL–CIO.

Thomas A. Carraway, Rives & Peterson, Birmingham, Ala., and Robert V. Atmore, Lindquist & Vennum, Minneapolis, Minn., for Brotherhood of R.R. Signalmen.

William J. Birney, Highsaw & Mahoney, P.C., Washington, D.C., and Richard A. Williams, Jr., Hvass, Weisman & King, Minneapolis, Minn., and Mitchell M. Kraus, Brotherhood of Ry., Airline & S.S. Clerks, Rockville, Md., for Brotherhood of Ry., Airline and S.S. Clerks.

Norton N. Newborn, Norton N. Newborn Co., L.P.A., Cleveland, Ohio, and Robert L. Lowe, Lowe, Schmidthuber & Lindell, Minneapolis, Minn., and Robert L. Hart, United Transp. Union, Cleveland, Ohio, for United Transp. Union.

Michael S. Wolly, Mulholland & Hickey, Washington, D.C., and Richard A. Williams, Jr., Hvass, Weisman & King, Minneapolis, Minn., for the remaining union defendants.

ROSENBAUM, District Judge.

In this class action lawsuit, plaintiffs allege that defendants have engaged in sexually discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Minnesota Human Rights Act, Minnesota Statutes, Section 363.01, *et seq.* The Court has jurisdiction over plaintiffs' federal claims pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. §§ 1331 and 1343. The Court has pendent jurisdiction over plaintiffs' state law claims.

This matter is currently before the Court on a contested motion for final approval of a proposed settlement agreement, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The Court, after considerable reflection and soul-searching, finds the proposed settlement to be a fair, reasonable, and adequate resolution of the matters at issue between the parties. *See Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Final approval is granted to the proposed settlement.

## I. *Facts*

### A. The Parties

The plaintiff class, as certified, consists of over 7,800 women who were employed by Burlington Northern Railroad Company (Burlington Northern, BN, or the railroad company) after July 27, 1977, and whose

claims of discrimination arose after that date.[1] The certified representatives of the plaintiff class are Margaret Holden, Cecilia Hoffman, Kathryn Lindaman, Delores Marsh, Darlene Sisk, Judith Pluff, Beverly Adams, Faye Plucker, Joleen McIlravy, and Margaret Serbus. Each certified representative's specific claim is set forth in the March 5, 1985, order of the Honorable Paul A. Magnuson. Two additional women, Karla Keefe and Diane Kubes, are named as plaintiffs in this case, but were found to be inadequate representatives of the certified class.[2]

The proposed settlement expands the scope of the class to include women who were either employed by BN or who were denied such employment after March 3, 1970.[3] This is, in fact, the class the plaintiffs sought to certify before Judge Magnuson. The settlement class consists of approximately 13,700 women. The representatives of that class are the certified class representatives plus Karla Keefe and Diane Kubes.

The plaintiffs are represented by the law firm of Sprenger, Olson & Shutes, P.A., (the Sprenger firm) of Minneapolis, Minnesota. The law firm of Davis, Barnhill & Galland, P.C., (Davis, Barnhill) of Chicago, Illinois, joined the Sprenger firm in its representation of plaintiffs in June, 1984. Davis, Barnhill appears as assisting counsel to the Sprenger firm. It does not represent, in its own right, any class members nor does it appear on behalf of any objectors to the proposed settlement.

The Equal Employment Opportunity Commission (EEOC) was allowed to intervene in this case by the April 10, 1984, order of the Honorable Floyd E. Boline. By that order, the EEOC's intervention was limited to the scope of the claims asserted by the private plaintiffs. The EEOC is not a party to this action nor does it appear on behalf of any of the plaintiffs in

1. *See* May 20, 1985, order of the Honorable Paul A. Magnuson.

2. *See* March 5, 1985, order of the Honorable Paul A. Magnuson.

3. *See* Proposed Settlement Agreement, paragraph 2.

this case. It is represented by attorneys from its Cleveland, Ohio, office.

The named defendants in this case are Burlington Northern, Inc., a holding company, and three of its subsidiaries, Burlington Northern Railroad Company, Milestone Petroleum, Inc., and BN Timberlands, Inc. The railroad company is the subsidiary against which this action is directed and against which the plaintiff class is certified. Its size and scope are outlined in the March 5, 1985, order of the Honorable Paul A. Magnuson. Although this action is not directed against the holding company and the remaining subsidiaries, they were retained as defendants in the event injunctive relief would have to be ordered against the holding company, so as to fully implement any relief plaintiffs might obtain.[4] The holding company and its subsidiaries are represented by the Saint Paul law firm of Oppenheimer, Wolff & Donnelly.

Also named as defendants in this case are thirteen separate railroad unions. Each union has its own collective bargaining agreement with BN. Each such contract governs a subgroup of employees at the railroad. Various counsel throughout the United States represent the union defendants.

### B. The Procedural History

The initial complaint in this action was filed on September 23, 1981. The 1981 complaint has been amended seven times, including one amendment as part of the present proposed settlement. In its final version, plaintiffs complain of failure to be hired; initial misassignment to positions traditionally held by females; inability to transfer to positions traditionally held by males; restraints upon upward mobility; diminished compensation; unfair demotion, discipline, and discharge; and physical and psychological assault through various forms of sexual harassment. Plaintiffs contend these wrongs were committed against them because of their female sex. Defendants deny they have discriminated against plaintiffs in any of their employment practices.

Since the inception of this case, the parties have actively engaged in discovery and other pretrial proceedings. Extensive written and oral discovery was conducted. Over 150,000 documents were produced, discovery of computerized data was accomplished, and approximately 164 depositions were taken at locations throughout the United States. Numerous motions on various issues were briefed and argued by the parties and considered and ruled upon by the Court. The Court issued no fewer than 88 formal orders. In addition, numerous pretrial conferences were held, especially in the months just prior to trial, when they were held on a weekly basis. In short, this was a hard-fought lawsuit, with zealous advocates representing the interests of each of their respective parties.

A class certification hearing, lasting approximately seven weeks, was held in November and December of 1984. Subsequent to that hearing, this cause was certified as a class action lawsuit pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. The certified class consists of "all women who are now or have been employed at any time after July 27, 1977, by Burlington Northern Railroad Company (or any of the subdivisions of predecessor Burlington Northern, Inc., from which Burlington Northern Railroad Company was created) and who have claims of discrimination which arose at any time subsequent to July 27, 1977." *See* May 20, 1985, order of the Honorable Paul A. Magnuson. The class was notified of this lawsuit in November, 1985.

Trial of this matter began on February 3, 1986, and proceeded until an agreement-in-principle was reached in June, 1986. At that time, trial was recessed and the parties crafted a formal proposed settlement agreement.

A preliminary approval hearing regarding the proposed settlement was held on July 17, 1986. Based upon all submissions and arguments received, the Court concluded that the proposed settlement was within the range of possible approval. *See Man-*

---

**4.** *See* March 5, 1985, order of the Honorable Paul A. Magnuson.

*ual for Complex Litigation,* Second, Section 30.44. By its order of July 23, 1986, the Court preliminarily approved the proposed settlement agreement and directed that notice concerning it be disseminated to the class. At the same time, the Court explicitly stated that by granting preliminary approval, it was not expressing any opinion concerning the ultimate merits of the proposed settlement.

A fairness hearing was held from September 30, 1986, to October 3, 1986. The parties were then given until October 20, 1986, to submit to the Court, in writing, any final thoughts they had regarding the proposed settlement.

C. The Settlement History

During the first three years after the initiation of this action, BN made no settlement offer. In November, 1984, on the eve of the class certification hearing, BN offered plaintiffs $750,000 to settle the entire case against the proposed class, including any claims for costs or attorneys' fees. No affirmative job relief was offered. This proposal was rejected.

In May, 1985, after a class had been certified and considerably reduced in size from that proposed,[5] BN again offered $750,000, this time only for the named plaintiffs and the class. This proposal was conditioned on the parties' ability to agree at a later time to a further sum for costs and fees. This offer was also rejected. No further settlement discussions between plaintiffs and BN occurred until December, 1985.

Prior to December, 1985, plaintiffs and the defendant unions drafted a proposed consent decree resolving the matters at issue among them. This decree was presented to the Court for preliminary approval, over the objection of BN, in November, 1985. The Court declined to preliminarily approve the proposed decree. The parties then submitted to the Court a revised version of the proposed consent decree in January, 1986. BN also objected to the revised decree. It, too, was rejected by the Court.

In an attempt to facilitate more expansive settlement discussions between the parties, the Court appointed a special master in December, 1985. One settlement conference was held before the special master to no avail. The parties discontinued further settlement discussions.

Although some settlement discussions between plaintiffs and BN were had immediately prior to the February, 1986, commencement of trial, serious discussions did not resume until April, 1986, after the close of plaintiffs' affirmative case. Initially, Court supervised discussions occurred between various representatives of the parties. These evolved in May, 1986, into discussions conducted by Paul Sprenger, lead counsel for the plaintiffs, and Wayne Faris, counsel for BN. In early June, certain counsel for the union defendants also became involved. Following these discussions, the parties informed the Court on June 17, 1986, that an agreement-in-principle had been reached resolving all matters in this case.

Shortly after being advised of the agreement-in-principle, the Court learned that attorneys Bridget Arimond of Davis, Barnhill, and Jack Sargent of the EEOC opposed the proposed agreement. They claimed the job relief outlined in the proposed settlement was illusory, the monetary relief was too low, and the proposed agreement was the product of fraud and collusion among negotiating counsel for the parties.

In light of the clear disagreement among counsel regarding the proposed settlement, the Court, prior to the preliminary approval hearing, afforded all counsel the opportunity to submit memoranda regarding their competing views as to the efficacy of the proposed agreement. All counsel were also given the opportunity to argue their positions at the hearing.

5. The class, as proposed, would have included women with hiring claims and with claims aris-ing from May, 1970.

Prior to the fairness hearing, the Court again allowed all counsel to submit memoranda addressing whether the proposed settlement should be given final approval. Class members were also allowed to submit to the Court any written thoughts they had regarding the proposed settlement. At the fairness hearing, proponents and opponents of the proposed agreement addressed the Court orally regarding its perceived merits and defects.

### D. The Proposed Settlement Agreement

The proposed settlement agreement primarily provides two types of relief: job and monetary. This relief is available only to the individuals in the settlement class, defined as:

> All women who have been or will be employed, or who have been denied employment, after March 3, 1970, by Burlington Northern Railroad Company (or any of the subdivisions of predecessor Burlington Northern, Inc. from which Burlington Northern Railroad Company was created) and who have been, are being, or, as a result of present policies or practices, will be discriminated against in the failure to hire or, as to those hired, with regard to terms or conditions of employment including, but not limited to, initial assignment, compensation, seniority agreements, the unions' duty of fair representation, maternity policies, merger protection, testing, training, disqualifications, surplus, harassment, apprenticeship, LETP training, dispatcher training, promotion, transfers, layoff, recalls, discipline, demotion and involuntary termination actions (discharge) because of their sex, except women who have opted out and who do not submit a claim form in the proceedings.

*See* Proposed Settlement Agreement, paragraph 2. The scope of the class includes all female applicants for employment at, and all female employees of, BN having claims of discrimination arising out of events which occurred at any time from March 3, 1970, through July 23, 1986, the date the proposed settlement agreement was preliminarily approved. *See* Proposed Settlement Agreement, paragraph 3. The class excludes individuals who may claim discrimination by a BN-constituent railroad prior to the date of that railroad's merger into BN. *See* Proposed Settlement Agreement, paragraph 2.

### 1. Monetary Relief

The proposed settlement agreement provides that BN will pay the settlement sum of $5,742,773. This sum was deposited, upon execution of the proposed agreement, in an interest bearing account with the First Bank of Minneapolis. Interest on the deposited sum is currently accruing. From this amount, $2,044,001 is set aside for the named plaintiffs and the class they represent. This plaintiffs' fund will remain at interest until all review of this decision is completed or until the total class distribution amount equals $2,500,000. As to the remainder of the settlement sum, $1,860,-138 will cover the out-of-pocket costs and expenses of the named plaintiffs, and $1,838,634 will pay plaintiffs for the attorneys' fees they have incurred from the Sprenger firm.

In addition to the settlement sum, the proposed agreement provides that BN will pay the expenses and attorneys' fees plaintiffs have incurred from Davis, Barnhill, up to $424,327. BN is also obligated to make full contribution to the Railroad Retirement Board based upon backpay awards to the named plaintiffs and successful class claimants. This retirement board payment is estimated at $200,000. The proposed settlement further requires that BN pay the cost of notice to the class, both mailed and published, as well as the expenses of administration of the settlement. The costs of the published notice alone exceeded $400,000 and the expenses of administration are expected to be $176,000. In all, the settlement provides monetary benefits to the plaintiffs and the class of approximately $7,000,000.

### 2. Job Relief

The proposed settlement agreement states that BN will provide up to 1150 jobs to class members as vacancies occur in the workforce, either through attrition or new

hiring. BN will provide: 1) up to 500 jobs to women with scheduled hiring claims,[6] 2) up to 250 jobs to women with scheduled initial misassignment claims, 3) up to 150 jobs to women with scheduled intercraft transfer claims,[7] 4) up to 50 jobs to women with Locomotive Engineer Training Program (LETP) and Dispatcher Training Program claims, and 5) up to 200 jobs to women with promotion from scheduled to exempt claims.[8] Those class members who are eligible for these positions will be selected from priority pools established in accordance with the terms of the proposed settlement agreement.

The proposed settlement agreement provides that a class member who obtains a job under the agreement may qualify for rightful place seniority; that is, the seniority she would now have if she had obtained the job when she originally applied.[9] A class member who obtains a job but does not qualify for rightful place seniority receives, for four years, or until June, 1993, whichever is earlier, fallback seniority instead. *See* Proposed Settlement Agreement, paragraph 37. This seniority allows the class member to retain her place in the seniority rank of her old job while accumulating seniority in the new position. In the event of lay-off or furlough from the new job, the class member may exercise her fallback right to obtain her old position. During any such lay-off or furlough, she continues to accumulate seniority in her new job even though she may have exercised her fallback seniority rights to keep herself working.

### 3. Additional Relief

Beyond the direct job and monetary relief provisions, the proposed agreement mandates BN to revise its policy on sexual harassment. It also requires BN to train its supervisors on sexual harassment awareness and requires the railroad compa-

ny to amend its safety rule book and manual of discipline investigations to specifically deal with sexual harassment. In addition, the proposed agreement obligates BN to post openings for entry level exempt positions and obligates the company to equalize the compensation rates for female and male exempt new hires.

With the history of this case behind the Court and with the proposed terms of the settlement currently before it, the Court's analysis now turns to whether those terms embody a fair, reasonable, and adequate resolution of this case.

## II. *Discussion*

Those plaintiffs who advocate the proposed settlement, as well as the railroad and the unions, are now before the Court seeking final approval of that agreement. They are accompanied by their proponent-counsel.

■ Federal courts look with favor on the voluntary resolution of litigation through settlement. *Armstrong v. Board of School Directors, Etc.,* 616 F.2d 305, 312 (7th Cir.1980); *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982). This is especially true in Title VII class action litigation, where the public interest in voluntary resolution is great. *Armstrong,* 616 F.2d at 313; *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977); *Officers for Justice v. Civil Service Com'n, Etc.,* 688 F.2d 615, 625 (9th Cir.1982), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). Title VII class actions are generally very complex. *Cotton,* 559 F.2d at 1331. And the duration of litigation in such cases often rivals that of even the most notorious antitrust cases. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1168 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). The resolution of Title VII class

---

**6.** A scheduled position is one covered by a union contract.

**7.** Crafts at BN include the positions of switchmen, carmen, brakemen, blacksmiths, oilers, etc.

**8.** An exempt position is generally a management position.

**9.** No award of rightful place seniority will be granted to anyone to a date earlier than July 28, 1977, however.

actions through settlement minimizes litigation expenses and also reduces the strain such litigation imposes upon already scarce judicial resources. *Armstrong*, 616 F.2d at 313; *Pettway*, 576 F.2d at 1218. Their resolution through settlement also promotes the goals of Title VII, since the Act itself emphasizes voluntary conciliation of disputes. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); *Armstrong*, 616 F.2d at 317 n. 18; *Cotton*, 559 F.2d at 1331; *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 846–848 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

■ Despite the emphasis on settlement of Title VII class actions, such actions, unlike most private civil actions, may only be settled with District Court approval. *Officers for Justice*, 688 F.2d at 623; *Parker*, 667 F.2d at 1208. Rule 23(e) of the Federal Rules of Civil Procedure states that "[a] class action shall not be dismissed or compromised without the approval of the court." Court approval of a class action settlement is necessary to assure that the interests of absent class members, as well as those of the named plaintiffs, have been protected. *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.) *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 165 (3rd Cir.1984) (Adams, J. concurring), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985); *In re General Motors Corp. Engine Interchange Lit.*, 594 F.2d 1106, 1122, 1139 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979); *In re Warner Communications Securities Litigation*, 798 F.2d 35, 37 (2nd Cir.1986); *Mendoza v. United States*, 623 F.2d 1338, 1344 (9th Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

The class action device, while capable of the fair and efficient adjudication of a large number of claims, is susceptible to abuse. *In re General Motors*, 594 F.2d at 1122; *Officers for Justice*, 688 F.2d at 623. The risk exists that the interests of some class members may be unduly sacrificed in an effort to achieve the "greatest good for the greatest number." *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir.1976). The possibility also exists that substantial rights of the class may be bargained away in exchange for relief which inures primarily to the named plaintiffs or to class counsel. *Armstrong*, 616 F.2d at 313. Because of the potential for abuse, protection of class interests cannot be left to class counsel alone. *In re General Motors*, 594 F.2d at 1122. The Court must act as the guardian of the class. *Grunin*, 513 F.2d at 123; *Mendoza*, 623 F.2d at 1346.

■ Although the Court must act to protect the interests of the class when reviewing the proposed settlement, the Court also recognizes that it is limited in its ability to change that agreement. The proposed settlement must stand or fall as a whole. *Officers for Justice*, 688 F.2d at 630. The Court is not to dictate or rewrite the terms of the proposed agreement. *In re Warner Communications*, 798 F.2d at 37; *Officers for Justice*, 688 F.2d at 630. The Court can make suggestions for modification of the proposed settlement's terms (and it did so when that agreement was first presented at the preliminary approval hearing) but it cannot unilaterally change them. *Officers for Justice*, 688 F.2d at 630; *Pettway*, 576 F.2d at 1172. The Court's role is properly limited to the minimum necessary to protect the interests of the class and the public. *Armstrong*, 616 F.2d at 315.

■ To assure that the interests of all class members have been protected, the Court must be convinced that the proposed settlement is fair, reasonable, and adequate before it is given final approval. *Grunin*, 513 F.2d at 123; *In re Flight Transp. Corp. Securities Litigation*, 730 F.2d 1128, 1135 (8th Cir.1984), *cert. denied*, 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984); *Georgevich v. Strauss*, 772 F.2d 1078, 1085 (3rd Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1229, 89 L.Ed.2d 339 (1986); *Officers for Justice*,

688 F.2d at 625. The burden is on the proponents of the settlement to so convince the Court by a preponderance of the evidence.[10] *In re General Motors,* 594 F.2d at 1126 n. 30; *Manual for Complex Litigation,* Second, Section 30.44. It is within the Court's sole discretion, however, whether to finally approve the proposed settlement. *In re Flight Transportation,* 730 F.2d at 1135; *Georgevich,* 772 F.2d at 1085.

■ In determining whether the proposed settlement is fair, reasonable, and adequate, by far the most important factor for the Court to consider is the strength of plaintiffs' case balanced against the amount offered in settlement. *Grunin,* 513 F.2d at 124; *Armstrong,* 616 F.2d at 322. Some of the accompanying factors to consider include:

1) the opinions of the participants, including class counsel, class representatives, and class members;

2) the complexity, expense, and likely duration of further litigation;

3) the extent of discovery completed and the stage of the proceedings; and

4) the evidence, if any, that the proposed settlement is the product of fraud or collusion.

*Grunin,* 513 F.2d at 124; *In re Flight Transportation,* 730 F.2d at 1135; *Bennett,* 737 F.2d at 986; *Jones v. Nuclear Pharmacy, Inc.,* 741 F.2d 322, 324 (10th Cir.1984); *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983); *Officers for Justice,* 688 F.2d at 625. Each factor will be examined in detail below.

A. The Strength of Plaintiffs' Case Balanced Against the Amount Offered in Settlement

1. The Strength of Plaintiffs' Case

The Court is well aware of both the strengths and weaknesses of plaintiffs'

case. The trial of this matter began on February 3, 1986, and encompassed approximately thirteen weeks of Court time. The Court heard the plaintiffs' constructive case, and the cross-examination of that case. The Court then heard the first nine of BN's witnesses. In all, the Court heard 88 witnesses, both in person and by way of deposition. In addition, several hundred documents were offered, admitted, and reviewed by the Court. In short, the Court is no stranger to this proceeding.

Despite the Court's familiarity with this case, it must not definitively comment on the strengths or weaknesses of plaintiffs' claims. While there is a substantial factual record in this case, that record remains incomplete. The Court has heard only a limited portion of defendants' constructive case and, of course, none of plaintiffs' rebuttal. Because of the incompleteness of the record, the Court is not in a position to reach ultimate conclusions as to the facts or law underlying the dispute. *Grunin,* 513 F.2d at 123; *Armstrong,* 616 F.2d at 314; *Officers for Justice,* 688 F.2d at 625; *Pettway,* 576 F.2d at 1169, 1214 n. 69. The Court is free, however, to analyze the facts and law relevant to the compromise. *Cotton,* 559 F.2d at 1330; *Pettway,* 576 F.2d at 1214 n. 69. In reviewing the proposed settlement, the Court will not try the case on the merits. *Cotton,* 559 F.2d at 1330; *Parker,* 667 F.2d at 1209. Nor will it substitute its opinion for that of class counsel or the litigants. *Armstrong,* 616 F.2d at 315; *Cotton,* 559 F.2d at 1330. On balance, the Court can hope for more, but may not presume its determination will go beyond "an amalgam of delicate balancing, gross approximations and rough justice." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468 (2nd Cir.1974).

Applying these principles, the Court sees that while the plaintiffs' case has substan-

---

10. The EEOC, citing *In re General Motors Corp. Engine Interchange Lit.,* 594 F.2d 1106 (7th Cir. 1979), suggests the proponents of the proposed settlement should prove its fairness, reasonableness, and adequacy by clear and convincing evidence, a standard of proof higher than by a preponderance of the evidence. The EEOC's reliance on *In re General Motors* is misplaced. In that case, the Court did hold the settlement proponents to a higher standard of proof, but only because the settlement proponents had in some manner improperly negotiated the settlement. *Id.* at 1126 n. 30. In this case, as is fully analyzed in the body of this opinion, the Court finds that no impropriety occurred in the settlement negotiations. The preponderance of the evidence standard then, is the appropriate standard of proof.

tial strengths, it also has significant weaknesses. Integral to the consideration of the strengths of a case on the merits is a consideration of the risks accompanying continuation of the litigation. *See Parker,* 667 F.2d at 1209–1210. The plaintiffs face numerous risks.

First, the Court is not convinced that plaintiffs would ultimately prevail. To prevail at trial, plaintiffs would have to show that BN engaged in a pattern or practice of discrimination against the class. *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984); *International Bro. of Teamsters v. United States,* 431 U.S. 324, 334–335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977); *Craik v. Minnesota State University Bd.,* 731 F.2d 465, 470 (8th Cir. 1984); *Griffin v. Board of Regents of Regency Univer.,* 795 F.2d 1281, 1287 (7th Cir.1986). Isolated or sporadic discriminatory acts by BN are insufficient to establish a pattern or practice of discrimination; rather, plaintiffs must prove by a preponderance of the evidence that discrimination is BN's standard operating procedure—the regular rather than the unusual practice. *Cooper,* 467 U.S. at 875–876, 104 S.Ct. at 2799; *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855; *Craik,* 731 F.2d at 470; *Griffin,* 795 F.2d at 1287. The Court perceives this as a difficult task indeed.

In their affirmative case, plaintiffs presented statistical evidence, buttressed by expert testimony and anecdotal witnesses to prove sexual discrimination at BN. Although some of this evidence was highly illustrative of individual instances of discrimination, the Court is not yet convinced the evidence was sufficient to support a finding of a pattern or practice of systemwide discrimination at Burlington Northern. "[A] class plaintiff's attempt to prove the existence of a companywide policy [of discrimination] ... may fail even though discrimination against one or two individuals has been proved." *Cooper,* 467 U.S. at 878, 104 S.Ct. at 2800.

There is generally no bright line indicating whether a company is simply a bruised apple or one that is rotten to the core. *See* *Id.* at 880, 104 S.Ct. at 2801. And whether plaintiffs had established such a line and whether BN had crossed it by the close of plaintiffs' case, the Court is not prepared to say. The Court can confidently say, however, that the relief provided plaintiffs in the proposed settlement agreement is 100 percent more than that which they would obtain if a pattern or practice of sexual discrimination at BN could not be established.

The Court also perceives difficulties for the plaintiffs in expanding the scope of the originally certified class. The class certified in this action is the product of a seven week certification hearing, during which numerous witnesses were presented and numerous documents were produced. The class as certified does not include anyone with either hiring discrimination claims nor with claims from May 3, 1970 to July 28, 1977.

At trial, plaintiffs vigorously urged inclusion of women with such claims into the class. They placed their proofs in this regard on the record in an effort to redefine the class as certified. At the time the proposed settlement agreement was presented to the Court for final approval, however, no hiring nor pre-July, 1977, class had been certified. At the close of plaintiffs' case, defendants moved to dismiss the hiring and pre-July, 1977, issues, if any, from this case. That motion was under advisement at the time the proposed settlement was reached.

The Court recognizes it has the power to modify the scope of the class at any time up to a resolution of the case on the merits. Fed.R.Civ.P. 23(c)(1); *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). Before altering the established law of the case as to the certified class, however, the Court must be presented with sufficient evidence justifying such action. The Court will not definitively state whether the evidence presented would prompt it to alter the certified class. Suffice it to say, however, that the Court perceives the relief in the proposed settlement agreement which inures to those with hiring or

pre-July, 1977, claims as distinctly advantageous to the plaintiff class.

Plaintiffs' statistical proof is absolutely insufficient to support the class' discipline claim. Plaintiffs' own statistical expert, Dr. Rebecca Klemm, acknowledged this from the witness stand. She noted that when accused of violating safety or work rules, women were simply not in violation of those rules more often than men. Dr. Klemm also found that for those determined to be in actual violation of a safety or work rule, the severity and extent of punishment did not differ between men and women.

While the Court has in no regard resolved the issue, a substantial question remains regarding the adequacy of plaintiffs' proof of sex discrimination as it relates to scheduled intercraft transfers other than transfers into the Locomotive Engineer Training Program. Transferring from one craft to another at BN is generally governed by collective bargaining agreements which on their face are gender neutral. Plaintiffs allege, however, that some provisions in the various collective bargaining agreements allow for management discretion in the exercise of some transfer opportunities, such that gender bias in transfer occurs.

Plaintiffs' other statistical expert, Dr. Stephen Michaelson, pointed out to the Court those provisions which he believes allow for such management discretion. Whether those provisions do, in fact, provide for management discretion in the exercise of transfer opportunities or instead have been subjectively interpreted by plaintiffs' expert without a foundational basis, the Court has, as yet, not decided.

Even if the Court were to assume management had a say in which worker was allowed to transfer from one craft to another, the proof is not yet definitive that sexual discrimination in transfers occurred. Plaintiffs' proof of discrimination in transfers consisted primarily of statistical evidence. It is true that statistics are a competent means to prove discrimination in employment. *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856; *Craik,* 731 F.2d at 470.

To be of value, however, statistical evidence must reflect valid comparisons of similarly situated people. For example, a statistical conclusion that women are paid less than men is of no significance unless the Court knows that the statistics take into account such items as differentials in hours worked, qualifications, experience, education, and expressions of interest. *See Hazelwood School District v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977); *Coble v. Hot Springs School Dist. No. 6,* 682 F.2d 721, 730 (8th Cir.1982); *EEOC v. Sears Roebuck & Co.,* 628 F.Supp. 1264, 1285–1288, 1302–1303 (N.D.Ill.1986).

In this case, Dr. Klemm found a deficit of female transfers between crafts. That deficit was found by comparing the gender breakdown of those in, for example, job A, and the gender breakdown of those in, for example, jobs B and C, which Dr. Klemm determined were "feeder pools" for job A. Dr. Klemm reasoned that in the absence of discrimination, the sexual make-up of job A should mirror the sexual composition of jobs B and C. It did not. Thus, plaintiffs concluded that discrimination in transfers occurred.

Cross-examination revealed, however, that Dr. Klemm did not control for the interests of men and women in transferring to different crafts. At this moment, the Court declines to assume that both men and women have the exact same interest in doing the exact same job, especially in light of plaintiffs' experts' statement that "[e]xperience indicates that, for whatever reasons, people of different race, sex, or ethnic backgrounds apply in different proportions for different jobs." Exhibit 2000, Vol. 10, page 6.

While the proof was not yet presented by defendants, the Court understands that they may well have offered testimony regarding the kinds of work women choose to perform. And, if given, such testimony might explain the female deficits plaintiffs found. Interest, rather than discrimination then, may account for the deficit in female transfers Dr. Klemm observed. *See Sears,* 628 F.Supp. at 1305–1315. Assuming this

to be true, it is at least conceivable that no finding of discrimination could be made on plaintiffs' transfer issue if this case were finally resolved by a trial on the merits. Such a determination would immediately eliminate the substantial relief provided in the proposed settlement agreement to those with transfer claims.

Absent a complete record on the merits, the Court must also question plaintiffs' claim of discrimination in scheduled compensation. Dr. Michaelson testified that he found a disparity in earnings between men and women in the scheduled workforce, based upon his compensation analysis. He concluded that the disparity was a function of the initial job assignment women received after hire. That is, women were more often initially assigned to clerical jobs after hire. These jobs did not lead to higher paying job options during a future BN career. On the other hand, he found that men were more often initially placed in jobs that later led to high paying operating craft positions.

The Court, while recognizing that the pay disparity Dr. Michaelson found may be attributable to discrimination by BN, cannot foreclose the possibility that at least some of the pay differential may again be the product of women's interest and volition. That is, women may choose, at hire, to be placed in clerical positions as opposed, for example, to laborer positions which lead to the higher paying craft jobs. In fact, plaintiffs' initial assignment statistical study found that both women and men were most commonly assigned to the jobs they asked for at hire, although it must also be pointed out that plaintiffs' expert found that of those not assigned to the job requested at hire, women, as opposed to men, were more often placed in clerical positions. Since choice may be a factor in the pay disparity between men and women in the scheduled workforce, the Court, at this point, cannot conclusively say that this disparity is the product of discrimination by BN.

There are clearly areas of plaintiffs' proof which were very compelling. But even as to these, the defense is not without its strengths. As an example, the plaintiffs have presented an impressive array of testimony regarding the physical, verbal, and mental harassment female employees at BN were subjected to on the basis of their sex. In spite of this evidence, the Court has not concluded at this time whether sexual harassment is an appropriate issue for class treatment.

The Court recognizes that sexual discrimination which creates a hostile or abusive work environment violates Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2405–2406, 91 L.Ed.2d 49 (1986). And an employer who tolerates such discrimination is clearly in violation of the Act. *Craik*, 731 F.2d at 481.[11] The question remains, however, as to when individual incidents of sexual harassment constitute a pattern or practice of discrimination such that classwide liability may be imposed on an employer. *See Cooper*, 467 U.S. at 875, 104 S.Ct. at 2799; *Teamsters*, 431 U.S. at 334–335, 97 S.Ct. at 1854; *Craik*, 731 F.2d at 470.

In *Craik*, the Eighth Circuit concluded that despite evidence depicting about 50 incidents of sexual harassment over a ten year period, this evidence did not support a finding that the work place was so oppressive as to support a sexual harassment claim. *Craik*, 731 F.2d at 481. In this case, even though plaintiffs have presented strong evidence of individual incidents of sexual harassment at BN, this Court will not definitively state at this time, in light of *Craik*, whether a pattern or practice of harassment existed at the railroad company.

Plaintiffs also appear to have a strong claim regarding BN's failure to accept women into the Locomotive Engineer Training Program. Even though this is a

---

11. The Supreme Court in *Vinson* specifically declined to issue a definitive rule on employer liability for sexual harassment in the work place. *Vinson*, 106 S.Ct. at 2408. The Court did begin to suggest the parameters, however. Employers are not automatically liable for sexual harassment by their supervisors. *Id.* At the same time, absence of notice to an employer of a supervisor's sexual harassment does not necessarily insulate that employer from liability. *Id.*

strong aspect of plaintiffs' case, Dr. Klemm, in the full fire of her affirmative proof, only found a shortfall of fewer than 30 female engineers. This fact must be kept in mind when evaluating the merits of the proposed settlement agreement. If plaintiffs were to prevail only on their LETP claim at trial, the number of people afforded relief would be few indeed. The proposed settlement agreement, on the other hand, provides relief to many, including those with LETP claims. It is clear then, that the proposed settlement agreement may provide much more relief to the plaintiff class than it could obtain through a resolution of this case on the merits.

In evaluating the varying strengths and attendant risks of plaintiffs' case, the Court must also bear in mind that it has heard little of defendants' affirmative case. The Court, however, received a preview of defendants' claims and defenses through their vigorous cross-examination of plaintiffs' anecdotal witnesses and statistical experts. In fact, as a result of defendants' cross-examination, certain major changes were made in some of plaintiffs' statistical proofs in the form of later introduced exhibits. By way of this preview, defendants have introduced nothing more than the merest suggestion of their defense. But if this defense is to be anything like the previews, the Court well expects it to be vigorous and unyielding. Such a vigorous defense may well undermine some of the strengths and will surely emphasize any weaknesses in plaintiffs' case.

Finally, in balancing the merits of plaintiffs' case, the Court must wrestle with the extraordinarily complex question: what about the clerks? The clerks at Burlington Northern are scheduled employees represented by the Brotherhood of Railway, Airline and Steamship Clerks (BRAC). They encompass, by far, the largest number of female employees at the railroad company. They are employed in positions traditionally held by women: office, secretarial, support, clerical, filing and related services. These positions have not, generally, been gateways to executive or highly-compensated jobs at BN.

In spite of the deficiencies in the clerk positions, the evidence at trial established that those positions are secure. Throughout BN's recent history, it has either had surplus employees which it acquired through mergers with other railroads or it has had economic difficulties. Both of these situations have required BN to layoff or furlough many of its employees. During the lay-offs or furloughs, the clerks have remained unscathed.[12] To the contrary, those employed in craft positions, which are male-dominated, have frequently been furloughed or permanently laid-off—and left without jobs or compensation.

When faced with this reality, the Court must then consider what damages would appropriately compensate a class member who has been wrongfully assigned to a clerk position and, thus, employed, as opposed to properly placed in a job which no longer exists. When balancing being out-of-work in the craft position originally sought, against working in the clerk position to which she was misassigned as a result of alleged discrimination, the Court cannot automatically conclude that the class member has been totally disadvantaged by BN's allegedly discriminatory decision. The Court recognizes that the railroad company's decision to initially misassign the class member may have been wholly inappropriate. If discriminatory, that decision affronts her right to be free from discriminatory acts. But the Court then must factor in the possibility that BN's wrongful decision has saved her economic livelihood. If found to be discrimination, the misassignment of a class member into the clerks' ranks raises difficult questions indeed.

In sum, plaintiffs have a case with objective merit, but in fairness it is not yet a

---

**12.** This is because of their unique protection agreement: a clerk with four years qualifying service has a guaranteed position, at full pay, for her entire working life. She may not be terminated except for cause and her compensa- tion continues in the event of lay-off or furlough. It is clear clerks have attained a level of employment security reached by few in our society, absent Article III considerations.

case upon which they may fairly claim victory, at least by the close of their evidence. Significant flaws and weaknesses remain in major portions of their constructive proof. These weaknesses may well loom large in the Court's pending decision on defendants' motions to dismiss or decertify the class. The above brief overview of the relative strengths and weaknesses of plaintiffs' case makes clear that plaintiffs' ultimate success on the merits remains an open question. With this thought in mind, the Court turns to an evaluation of the amount offered to plaintiffs in settlement.

### 2. The Amount Offered in Settlement

#### a. Monetary Relief

As was briefly outlined in Section I.D. above, the Court is presented with an agreement, under the terms of which approximately $7,000,000 is at issue. Of that sum, $2,044,001 is reserved for payment to the class along with any interest accrued on the entire $7,000,000 until November 15, 1986. After November 15, 1986, plaintiffs will receive interest only on those sums intended for disbursement to the class. When the total class payment fund equals $2,500,000 or more,[13] the fund shall be disbursed to the class after first deducting $225,000, which is reserved for distribution to the named plaintiffs. The remaining $2,275,000 is to be divided among those with the 400 most meritorious claims[14] for 1) denials of promotion to and within exempt positions, 2) denials of scheduled intercraft transfers, and 3) misassignment to jobs. The breakdown of the fund is as follows:

Category A—Forty percent of the fund shall go to the 100 class members with the most meritorious claims of denial of promotions to and within exempt positions. The average award for these

women shall be $9,100 with a minimum award of $3,000.

Category B—Forty percent of the fund shall go to the 150 class members with the most meritorious claims of denial of scheduled intercraft transfers. The average award for these women shall be $6,067 with a minimum award of $3,000.

Category C—Twenty percent of the fund shall go to the 150 class members with the most meritorious claims of job misassignments. The average award for these women shall be $3,033 with a minimum award of $1,000.

It should be noted that class members with active or potentially active administrative charges of sex discrimination or sex discrimination lawsuits against BN, will automatically be placed in one of the above outlined categories, as will those who testified at trial concerning their claims against BN.

Those opposing the proposed settlement contend the dollar amount reserved to the class is simply too low. They come to this conclusion by making their own assessment of the number of plaintiffs' claims they believe to be certain winners. They then estimate the dollar values for such claims in accordance with their own belief as to the value of those claims if plaintiffs had prevailed at trial. Based on their analysis, the objectors contend the class should receive well in excess of the $2,500,000 allocated for distribution to its members.

It appears to the Court that in making their assessments, those opposing the proposed settlement have made three significant errors, which in the aggregate prove fatal to their position. First, the objectors base their dollar valuations on their own perceptions of plaintiffs' strongest claims. Their perceptions are not determinative, however. It is this Court which determines the merits of plaintiffs' claims and this

---

**13.** No distribution will be made until the expiration of the appeal period or the final resolution of any appeal, whichever is later. In the event of appeal, the total sum available to the class may well be in excess of $2,500,000, since the time required for resolution of these matters may take an extended period.

**14.** The merits of a claim are determined by an objective scoring procedure which is outlined in the formula supplement to the proposed settlement agreement. A claim is awarded points based on sworn responses by the claimant. A claimant's responses are subject to verification by counsel during the administration of the proposed settlement.

Court's determinations may not comport with the determinations of the objectors. As outlined above, the Court perceives that plaintiffs' case is tenuous as to many of their claims. And even as to those claims that are strong, the Court has not conclusively determined whether they rise to the level of a pattern or practice of discrimination. *See Cooper*, 467 U.S. at 875, 104 S.Ct. at 2799; *Teamsters*, 431 U.S. at 334–335, 97 S.Ct. at 1854; *Craik*, 731 F.2d at 470. It is clear, then, that the opposition's conclusions regarding plaintiffs' meritorious claims may not be the appropriate basis upon which to assess the dollar value of plaintiffs' case.

Second, even assuming the objectors are correct in their assessment of plaintiffs' most meritorious claims, there is nothing to indicate that the dollar amounts set by the objectors for those claims are appropriate. Not only do the objectors differ among themselves as to the value of any particular claim, they each are internally inconsistent with their valuations from memorandum to memorandum submitted to this Court. In addition, the factual basis for the valuation of any particular claim is never revealed. Instead, objectors ask the Court to assume a particular claim is worth X dollars and then go on to multiply X dollars by the number of women who have that particular claim to assess that claim's value. The objectors' valuations require the Court to engage in assumptions with no basis in fact. This the Court cannot and will not do.

Finally, the objectors value plaintiffs' claims based on their belief of the optimal amount the class could recover if it succeeded in this proceeding. They next apply a discount factor, which they assert accounts for the risks of continued litigation, to determine an appropriate settlement amount. The Court finds that this valuation method is inappropriate. Even if the class succeeded in this proceeding, there is nothing to say it would recover the optimal amount.

The trial of a Title VII class action is generally bifurcated into a liability phase and a remedial phase. *Craik*, 731 F.2d at 470. If, at the liability phase, the class as a whole is successful in proving the defendant engaged in a pattern or practice of discrimination, then each individual class member enters the remedial phase with an established presumption of discrimination and a presumed entitlement to damages. *Teamsters*, 431 U.S. at 359, 361–362, 97 S.Ct. at 1867–68; *Craik*, 731 F.2d at 470. This presumption is rebuttable, however. At the remedial phase the defendant may show that despite its overall policy of discrimination, individual class members were not, in fact, victims of discrimination. *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 772, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Teamsters*, 431 U.S. at 359, 362, 97 S.Ct. at 1866, 1868; *Craik*, 731 F.2d at 470. If the defendant is successful in rebutting the presumption, the class member receives nothing.

In this case, even if the class is successful in proving a pattern or practice of discrimination at BN, it is possible BN could prove that numerous individual class members faced no discrimination. This being so, it is quite possible that the agreed proposed settlement may provide more for the whole class than could be realized after multiple remedial phase proceedings. With this possibility in mind, the Court cannot conclude that the objectors' optimal valuation of plaintiffs' claims is an appropriate basis upon which to determine the amounts acceptable in settlement.

Objectors forget that compromise is the essence of settlement. *Armstrong*, 616 F.2d at 315; *Cotton*, 559 F.2d at 1330; *Pettway*, 576 F.2d at 1214 n. 69. The inherent nature of compromise is the relinquishment of certain rights or benefits in return for others. *Armstrong*, 616 F.2d at 315; *In re General Motors*, 594 F.2d at 1135; *see also Grunin*, 513 F.2d at 125. Compromise requires "an abandonment of the usual total-win versus total-loss philosophy of litigation in favor of a solution somewhere between the two extremes." *Armstrong*, 616 F.2d at 315.

Here, it appears, the objectors would only be satisfied with a settlement that provides a dollar amount close to their own

perception of a sum appropriate after a total victory. It is not necessary or expected, however, that litigants will obtain through settlement all they might have realized through a victorious trial. *Pettway*, 576 F.2d at 1214 n. 69; *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 618 (N.D.Cal.1979). This is particularly true in cases, such as this, where monetary relief is but one form of relief provided to the plaintiffs. *Officers for Justice*, 688 F.2d at 628. It is the complete package, taken as a whole, rather than the individual component parts, which must be examined for overall fairness. *Id.* A cash settlement amounting to only a fraction of the potential cash recovery (and the present proposed settlement is not such a recovery) does not in itself render the settlement unfair or inadequate. *Grinnell*, 495 F.2d at 455; *Officers for Justice*, 668 F.2d at 628; *Parker*, 667 F.2d at 1210 n. 6; *Boyd*, 485 F.Supp. at 618. "In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n. 2; *see also Parker*, 667 F.2d at 1210 n. 6.

■ The Court, in evaluating the merits of plaintiffs' case against the dollars offered in the proposed settlement, concludes that the proposed settlement provides fair, reasonable and adequate monetary relief in a sum rationally calculated to compensate the women of the class. It is true that if this case proceeded to a resolution on the merits, some women could well take much more than is offered in settlement here. But many women could take much, much less or none at all. This alone, however, does not conclude the inquiry into whether or not the proposed settlement is fair, reasonable and adequate.

As seen above, the objectors have made no real showing that the monetary relief the plaintiff class could obtain after a trial on the merits would be substantially greater than that they will currently receive from the proposed settlement. On the oth-

er hand, it is clear that any after trial relief would likely be substantially diluted by the delay inherent in acquiring it. *See Officers*, 688 F.2d at 629. Therefore, during the pendency of any continued litigation of this case, "many of the immediate and tangible benefits accruing from the settlement would be lost." *Id.* This fact alone makes the proposed settlement an attractive resolution of this case.

**b. Job Relief**

■ As was more fully outlined in Section I.D., above, the proposed settlement agreement provides that BN will offer up to 1150 jobs, as vacancies occur, to class members with discrimination claims arising from failures in scheduled hiring, scheduled initial assignment, scheduled intercraft transfer, locomotive engineer and dispatcher training, and promotion from scheduled to exempt positions. Class members who obtain these jobs will receive either rightful place or fallback seniority. They are to be selected from a priority pool of individuals determined in accordance with the terms of the proposed settlement agreement.

**(1) The Merits of the Job Relief**

The Court sees three major benefits which accrue to a class member under the job relief portions of the proposed settlement. First, and foremost, the class member gets the position she originally sought. This most important relief is a predicate to the second benefit—the availability of retroactive seniority. Under the terms of the proposed settlement, for example, a woman with a scheduled hiring claim who receives a job in July, 1987, may well report on the first day of that job with ten years retroactive union seniority.[15] This would leap-frog her seniority over that of many of her colleagues. According to union counsel, this rightful place seniority is rarely afforded in the settlement of discrimination cases.

---

**15.** Pursuant to paragraphs 23 and 31 of the proposed settlement agreement, rightful place seniority for those with hiring claims is calculated from July 28, 1977, to the time the class member receives her rightful place job, unless she receives it after December 31, 1990. If so, then she will receive up to but no more than nine years retroactive seniority.

To the secondary benefit of rightful place seniority is added a third. Even if the class member who obtains a job pursuant to the proposed settlement agreement does not qualify for rightful place seniority, she will receive fallback seniority. This offers the class member transfer options she may never have realized before.

Under the existing collective bargaining agreements at BN, a person transferring from one scheduled position to another either immediately loses seniority in the position from which she has departed, or loses it within a few months. The transferring person would go to the trailing end of the seniority line if she returned to the position from whence she came. There was testimony at trial indicating this lack of fallback seniority protection often made transfer impossible. For example, a clerk covered by a BRAC collective bargaining agreement retains her clerk's seniority for only three months after any transfer. It could well be professional suicide for a BRAC clerk with a number of years of seniority to attempt to transfer to a higher paying operating craft position, when the possibility looms large that she may be furloughed from that craft position three or more months after her transfer. If that occurs, she no longer has the immediate monetary benefits of the new craft position nor any of the benefits of the old clerk position.

Under the proposed settlement agreement, the same BRAC clerk after transfer will accumulate benefits in her new position while retaining seniority in the old. In the event of furlough from the new position, she may exercise her fallback seniority rights to obtain her old position. And while she is working in that old position she will continue to accumulate seniority in the new job. The Court finds that the fallback seniority provisions of the proposed settlement agreement afford class members significant relief, even without the additional provisions for rightful place seniority.

The Court recognizes two additional benefits in the job relief provisions of the proposed settlement agreement. First, up to 500 jobs are provided to those with hiring claims; and, second, up to 150 jobs are provided to those with scheduled intercraft transfer claims. As was noted in Section II., A., 1. above, at the time this proposed settlement was presented to the Court, a hiring class had not been certified. And from the proof presented to the Court by the close of plaintiffs' case, it was in no regard clear that the certified class would be expanded to include those with hiring claims. In addition, there were significant unresolved issues regarding plaintiffs' proof of their intercraft transfer claim. In light of this, it is fair to say that the proposed settlement agreement provides a recovery potential for some who may well have been denied any relief if forced to final judgment. These facts weigh in favor of approval of the proposed settlement agreement.

### (2) The Objections to the Job Relief

In evaluating the job relief provisions of the proposed settlement, the Court has carefully considered the objections made by opposing counsel and class members. Their major objection is that the job relief afforded in the proposed agreement is "illusory." They complain first, that over the life of the proposed settlement agreement, few, if any, vacancies will occur at BN such that the 1150 jobs provided for in the proposed agreement will be filled; and second, if vacancies occur, few, if any, women will receive rightful place seniority because of the procedures they must go through to obtain that seniority. The Court, in weighing these objections, does not find them significant enough to reject the proposed settlement.

### (a) The Likelihood of Vacancies

Objectors contend that the jobs provided for in the proposed settlement agreement will never be obtained because vacancies will not occur at BN in the immediate future. This, the opposition claims, is because BN is downsizing the company and is not hiring new employees. The Court recognizes that BN has, in the recent past, been reducing its workforce. The Court does not find that only negative inferences can be drawn from this fact, however.

The future can never be perceived, other than through a glass and darkly, but in this instance the Court is convinced that there is more than a substantial probability that the positions outlined in the proposed settlement agreement will be available. The past is not always the best predictor of the future. And what may today seem an unlikely possibility, may tomorrow be a reality.

An example from the fairness hearing serves to illustrate this point: at the hearing it was disclosed that BN graduated eight LETP classes in 1986. This was an astounding revelation since BN has held very few LETP classes since 1980 and no classes since 1984. The Court questioned counsel for the EEOC at the fairness hearing about this turn of events. The Court found that this development was totally unexpected by the EEOC, and was told it had not believed any engineers would be trained in 1986.

It became clear at the hearing that the new LETP classes resulted, at least in part, from: a) the complete absorption into BN of surplus engineers from its mergers with other railroads, b) the natural aging of engineers whose number had not been replenished by new entrants in the past half-decade, and c) regular attrition. But the key reason was set forth by counsel for the Brotherhood of Locomotive Engineers and Railroad Yardmasters of America. He pointed out that a new collective bargaining agreement was in effect between BN and the engineers which gave the railroad company an economic incentive to seek new engineering personnel. The new contract sets a lower pay scale for new engineers. As a result, BN has been "buying out" those highly-paid, high-seniority engineers, and replacing them with lower-paid, low-seniority engineers. Thus, eight new LETP classes in 1986.

This development in the engineering program indicates the risks inherent in attempting to predict the future in a fluid economic market; a changed circumstance can instantly invalidate any set of assumptions. The job relief outlined in the proposed settlement agreement, far from being illusory as urged by the objectors, may, in fact, be an economic certainty.[16]

In this regard, Drs. Klemm and Michaelson have submitted a joint affidavit in support of the proposed settlement agreement. They point out that normal attrition and regular employee turnover will almost certainly provide enough vacancies at BN for job relief claimants to fill, regardless of the fortunes of the railroad, the downsizing of the company, or the failure of the company to create new positions. There are fewer and fewer employees who need to be absorbed into BN's workforce from the mergers of other railroads into BN. Since a sufficient number of "merger" employees have been absorbed into BN's workforce, the accession of 1150 *Holden* job claimants into BN's personnel labor pool over the next three to six years is quite probable.

(b) The Procedures for Receiving Rightful Place Seniority

In addition to asserting that vacancies will not occur at BN, the objectors claim that those who do obtain jobs will not actually receive rightful place seniority. The objectors contend that a successful job relief claimant will be denied this seniority because the proposed agreement's procedures for obtaining it will effectively deny her such relief. The Court disagrees; it does not find the procedures a job claimant must complete to obtain rightful place seniority to be as onerous or unfair as objectors suggest.

First, before proceeding, the Court wishes to make clear that the terms of the

---

**16.** The Court, in making this observation, has in mind recent news reports, e.g. Oslund, "Showdown at Burlington Northern," *Minneapolis Star and Tribune,* June 21, 1987, Sec. D, pg. 1, col. 1, suggesting adjustments in the work force and changes in the labor contracts at Burlington Northern. Based on the reports, facile arguments can be made to suggest either the inconceivability or the inevitability of the proposed settlement-based job openings. The potentially changing conditions at the railroad company have been considered by the Court; the Court maintains its views of the efficacy of the job-related relief outlined in the proposed settlement agreement.

proposed settlement agreement assure that an appropriately qualified job claimant will automatically receive a job at BN when a vacancy occurs and will automatically receive fallback seniority. These two benefits are not susceptible to challenge. At the same time, the proposed agreement contemplates that a claimant is not automatically entitled to rightful place seniority. She must show an entitlement to rightful place seniority, and a favorable or unfavorable decision in this regard is susceptible to challenge.

In order to qualify for rightful place seniority, a class member must show, through either a written application or a contemporaneous written document, that she previously applied for the position she now seeks. She must also show she was denied that position and that she was and is qualified for it. Finally, she must show that a less qualified male was awarded the position or that an equally qualified man received the position as a result of discrimination. *See* Proposed Settlement Agreement, paragraph 35. If the claimant contends she was initially misassigned or denied a transfer, then she must also identify the man awarded the position she claims was denied to her. *See* Proposed Settlement Agreement, paragraph 38.

BN is responsible for initially determining the merits of all rightful place seniority claims and will notify the involved parties of its determination. If BN denies a claim, it must set forth the specific basis for denial. If the claimant or the union is dissatisfied with BN's determination, either party may challenge it at a cost-free hearing before a United States Magistrate. The magistrate will then resolve the issue of rightful place seniority. The magistrate's decision is final and binding upon the parties. *See* Proposed Settlement Agreement, paragraph 39.

Those who oppose the proposed settlement claim it creates three insurmountable barriers to obtaining rightful place seniority. First is the requirement that a claimant produce a written application or a con-

temporaneous written document evidencing her application for the position. Second, is the failure to provide a claimant with free assistance of counsel at the hearing before the magistrate, should she or a union challenge BN's determination. Third is the failure to provide a claimant who challenges BN's determination with a presumption of discrimination in her favor at the hearing before the Magistrate.

i) The Requirement of A Written Application or A Contemporaneous Written Document

The Court finds reasonable the requirement that a rightful place seniority claimant produce a written application or a contemporaneous written document to show that she, in fact, applied for the position for which the retroactive seniority is sought. This requirement does not put an unfairly onerous burden on a claimant. The proposed agreement itself does not require a particular kind of writing as proof of application. It could range from a formal employment application filed with the railroad company, to an entry in an "employment applicant flow log,"[17] to an EEOC complaint, to a diary entry or calendar note, or to one of countless other possibilities. The point is, there must be something tangible to validate the occurrence of the prior-denied application to justify awarding retroactive seniority. Considering the value of rightful place seniority, which could encompass years of retroactive seniority, such validation is absolutely reasonable.

The reasonableness is clear when the consequences of retroactive seniority are considered: it is obvious that retroactive seniority places its recipient ahead of others who have obtained their seniority by the calendar. This enhanced seniority gives the recipient a preference in job placement and compensation, and allows the recipient to avoid lay-off and furlough. While it is obvious that retroactive seniority benefits its recipient, it at the same time has a necessary and occasionally burdensome affect on those who have obtained

---

**17.** An employment applicant flow log is a record, regularly kept and maintained by the railroad company, indicating the names of all persons who applied for a particular position at a particular location within the BN system. Many of these logs were introduced into evidence in this case and should be made readily available to class members.

their seniority in regular course. Every employee who holds less seniority than that granted to the recipient of retroactive seniority is automatically bumped back one slot on the seniority roster to make room for the retroactive recipient. Such loss of seniority could make the difference between keeping and losing a job when an employee is confronted with lay-off or furlough.

Those who obtained their seniority by the calendar will feel the ultimate weight of a class member's enhanced seniority. They, it is essential to note, have not been accused of committing the discriminatory acts alleged in the complaint, yet it is on them that the consequences of rightful place seniority fall. The Supreme Court in *Bowman*, 424 U.S. at 773–780, 96 S.Ct. at 1268–72, has made clear that under proper circumstances it is appropriate for arguably innocent employees to shoulder the burden of retroactive seniority relief in order to promote the central "make whole" objective of Title VII. Cf. *Wygant v. Jackson*, 476 U.S. 267, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986). Even so, as a protection for them, alone, the requirement of some independent written validation of a prior job application is reasonable.

ii) No Assistance of Counsel

No counsel is provided for a class member at a hearing before the magistrate when she or a union challenges BN's determination of rightful place seniority. Although much has been made of this fact by the objectors, the Court is not swayed by the arguments or the horribles which have been paraded.

The class member will enter the hearing with all the information class counsel put forth in originally asserting her eligibility for rightful place seniority. She will have a copy of BN's decision, and BN's supporting data, including employment statistics, and relevant information within BN's control. She will also have available to her any relevant BN witnesses. *See* Proposed Settlement Agreement, paragraphs 36 and 39. The class member, then, will come to the hearing with the necessary factual resources to do battle. She will not, however, have a champion to do battle for her. A champion will not be necessary, however.

Although a court is not, admittedly, the easiest place to approach, the hearings contemplated in the proposed settlement are informal. The class member will not be expected to know all the formalistic rules of evidence or procedure when presenting her claim before a magistrate; rather, she will simply be required to tell her side of the story and to present something in support of that story. She will be given the special consideration that pro se litigants always receive in federal court. *See Haines v. Kerner*, 404 U.S. 519, 520–521, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Hughes v. Rowe*, 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980); *Bates v. Jean*, 745 F.2d 1146, 1150 (7th Cir.1984). There is no ground to suggest she will not receive justice, regardless of her representation. The absence of assistance of counsel is not unreasonable under the circumstances.

iii) No Presumption of Discrimination

A class member who opposes BN's rightful place determination enters the subsequent magistrate hearing without a presumption of discrimination. Relying upon the Sixth Circuit's decisions in *Franks v. Kroger Co.*, 649 F.2d 1216 (6th Cir.1981) (*Franks I*) and *Franks v. Kroger Co.*, 670 F.2d 71 (6th Cir.1982) (*Franks II*), the objectors contend the proposed settlement cannot be approved as fair, reasonable, and adequate without such a presumption at the hearings. This Court disagrees.

Objectors' reliance upon *Franks II* and its progenitor *Franks I* is misplaced. In *Franks I*, the Court was faced with a class settlement in which the only real relief afforded a class member was the opportunity to appear before a magistrate and attempt to prove an individual Title VII claim without a presumption of discrimination. *Id.* at 1225. The Sixth Circuit noted that pursuant to the terms of the settlement, a class member who asserted a claim at a magistrate's hearing would have a burden of proof more onerous than would be required if litigating an individual Title VII claim. *Id.* at 1225–1226, 1226 n. 7. In addition, the Court specifically noted the lack of any other substantial relief in the

agreement. *Id.* at 1226. Upon these bases, the Sixth Circuit properly rejected the settlement agreement as insubstantial. Because of a procedural defect, the decision in *Franks I* was vacated and the matter was reheard. Upon rehearing, the Court approved the settlement because it had been implemented by both the parties and the Court so as to afford class members the missing presumption. *Franks II*, 670 F.2d at 72–73.

It is truly a tortured and impoverished analysis which analogizes the comprehensive proposed settlement in this case with the agreement at issue in the *Franks* cases. First, the proposed settlement agreement in this case provides a class member with substantially greater relief than simply the opportunity to present her claims to a magistrate. It provides significant monetary relief, payments for costs and attorneys' fees, jobs when vacancies occur, and fallback seniority. Again, it must be emphasized that the only relief subject to dispute is rightful place seniority. Second, a class claimant in this case has the exact burden of proof at the magistrate hearing as she would if she individually litigated a Title VII claim; it is not more onerous. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); Proposed Settlement Agreement, paragraph 35.[18] It is clear to this Court that pursuant to the terms of the proposed settlement agreement, class members are better off than if they had brought their actions individually. *See Franks I*, 649 F.2d at 1225. Therefore, no presumption of discrimination need follow them into the magistrate hearings.

As an aside, the Court notes that a presumption of discrimination is counter-intuitive. Why should a class member be cloaked at this point with the presumption sought? This is a settlement. It is not the

Treaty of Versailles. *Treaty of Versailles*, June 28, 1919, 11 Martens Nouveau Recueil (ser. 3) 323.

There has been no admission or adjudication of wrong-doing on the part of any party. *See* Proposed Settlement Agreement, page 5 and paragraph 67. In other words, plaintiffs did not win this case. At the same time, defendants did not win. This case concluded in a settlement, negotiated at arm's length, the result of a difficult, contentious and highly charged lawsuit in which no quarter was asked and none was given. The parties engaged in a vigorous give-and-take and hammered out a proposed agreement which is sweet in some aspects to one party and unpalatable in some aspects to another. A class-wide presumption of discrimination is impossible under these circumstances. Such a presumption is only available upon the conclusion of a liability proceeding, with a victory on one side and a defeat on the other. *See Teamsters*, 431 U.S. at 359, 362, 97 S.Ct. at 1866, 1868; *Craik*, 731 F.2d at 470. Here, the class has not prevailed on the merits; indeed, it has not yet triumphed over defendants' motions to dismiss or decertify the class. The presumption the objectors seek does not match the presumption they show. It is fair and reasonable that a class member enter the magistrate's rightful place seniority hearings with no presumption either for or against her.

B. The Opinions of the Participants, Including Class Counsel, Class Representatives, and Class Members

In evaluating the fairness, reasonableness, and adequacy of the proposed settlement agreement, the Court must consider the opinions of the participants in this action, including class counsel, class representatives, and class members. *Grunin*, 513 F.2d at 124; *Bennett*, 737 F.2d at 986;

---

**18.** The Court recognizes that to establish a prima facie case of discrimination, a woman with an initial misassignment or a denial of transfer claim must, in addition to the showing required by *McDonnell Douglas*, identify the man who was awarded the position she sought. *See* Proposed Settlement Agreement, paragraph 38. The Court does not view this as so onerous a burden as to require that a class member be

presumed a discrimination victim at the magistrate hearings. In most cases, the Court believes the claimant will know the identity of the man who received the job to which she believes she was entitled. If not, that information should be readily available from BN, which maintains exact records reflecting the name and precise date of employment of each scheduled employee.

*Jones,* 741 F.2d at 324. There is, to significantly understate the point, considerable disagreement among counsel for the plaintiffs as to the efficacy of the proposed settlement. The Sprenger firm supports the settlement. Davis, Barnhill, along with counsel for the EEOC stand in opposition. Counsel for the railroad and each of the defendant unions are allied in their support of the proposed agreement.

As was noted in Section I.C. above, all counsel vociferously advised the Court of their thoughts and feelings regarding the proposed settlement. They were invited to, and each did, in fact, fully brief the Court on whether or not the proposed agreement should be preliminarily approved. Prior to the fairness hearing, all counsel voluminously briefed the Court regarding final approval, and submitted numerous affidavits and evidentiary materials. At the fairness hearing, itself, all counsel presented their comments and arguments as well as documentary evidence and witnesses. In short, the Court was immersed in the merits and defects of the proposed settlement as perceived by counsel; none left a stone unturned.

Counsel who support the proposed agreement suggest this Court should give great weight to their opinions because of their experience not only in this case but in employment discrimination and class action litigation in general. They suggest a proposed settlement commended by experienced counsel such as themselves should be accorded a presumption of reasonableness. They indicate that objecting counsel have had far less experience than they and suggest objecting counsels' views should be, if not totally disregarded, at least viewed with a jaundiced eye.

The Court recognizes it is entitled to rely on the judgment of experienced counsel when evaluating the merits of a proposed class action settlement. *Cotton,* 559 F.2d at 1330; *Pettway,* 576 F.2d at 1215; *Reed,* 703 F.2d at 175. And that in making such an evaluation, the Court should hesitate to substitute its own judgment for that of experienced counsel. *Armstrong,* 616 F.2d at 315; *Cotton,* 559 F.2d at 1330. The fact that supporting counsel approve of a proposed settlement is not determinative, however. *Pettway,* 576 F.2d at 1215. The Court is not simply a rubber stamp for the views of supporting counsel. This is especially true in light of the Court's duty to act as guardian of the class. The Court realizes a potential conflict of interest always exists between an attorney and a class. *Pettway,* 576 F.2d at 1215. An attorney may be much more prone to settle than a class, especially if a large fee award is at stake. *Id.* at 1215–1216. Because of this potential conflict, the Court cannot let the views of experienced counsel dictate whether a proposed class action settlement should be approved. Therefore, the Court has considered and will consider the views of supporting counsel when evaluating the proposed settlement agreement in this case, but by no means will the proposed agreement be presumed reasonable based on counsels' support alone.

The Court has considered and will also consider the views of objecting counsel when determining the fairness, reasonableness, and adequacy of the proposed settlement. The Court recognizes that opposing counsels' objections cannot block approval of the settlement. *See Local Number 93 v. City of Cleveland,* — U.S. —, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986). Their objections, however, are not taken lightly. Although opposing counsel may not have the general experience in employment discrimination or class action litigation that supporting counsel does, it is clear that opposing counsel are intimately familiar with this case. The Court notes that they exhibited great skill and zeal in both the trial and settlement review phases of this case. As such, their objections have been and are closely examined and carefully considered.

Opposing counsel have three major complaints regarding the proposed settlement; that the monetary relief is too low, that the job relief is illusory, and that there was fraud and collusion among supporting counsel in negotiating the proposed agreement. The first two concerns have been addressed above in section II. A. of this opinion. The third will be addressed at section II. E. below.

In light of the clear disagreement among counsel regarding the advisability of the proposed settlement, the Court took the caution of including, in the notices of the proposed settlement sent to the class and published in various newspapers, language informing the class of counsels' disagreement. The class notices contained toll-free telephone numbers which class members could call to get further information from both supporting and opposing counsel. The notices also informed class members that they could appear at the fairness hearing, either individually or through counsel, in person or by letter, and express their own views of the proposed settlement. The notices were mailed to over 13,700 women and were published eight times in fifty-two local newspapers and three times in a national newspaper.

As a result of the notices, the Court received eighty-eight written comments from class members regarding the proposed settlement. Of those, sixty-eight were in opposition to the proposed agreement. Three of the objections were received from Diane Kubes, Delores Marsh and Joleen McIlravy, named plaintiffs in this case. The written objections generally claimed that either the monetary relief provided for in the proposed agreement was too low or the job relief was illusory.

At the fairness hearing, eight class members addressed the Court regarding the proposed settlement. Of those, two named plaintiffs, Judith Pluff and Cecelia Hoffman, spoke out against the proposed agreement and the lead named plaintiff, Margaret Holden, spoke out in its favor. The remaining class members who addressed the Court were in opposition to the proposed settlement. Their concerns focused on the adequacy of either the monetary relief or the job relief.

In sum, though notice was sent to over 13,700 women and was published eight times in fifty-two local newspapers and three times in a national newspaper, and even though advice of disapproval was available from, and was given by opposing counsel to inquiring class members, only seventy-two class members indicated dissatisfaction with the terms of the proposed agreement. This number constitutes less than one percent of the total class. The Court recognizes that it should hesitate to infer that the class supports the proposed settlement merely because the majority of its members are silent. *Armstrong*, 616 F.2d at 326; *In re General Motors*, 594 F.2d at 1137. But when this silence is coupled with other indicia of fairness, it provides further support for approval. *Armstrong*, 616 F.2d at 326; *Grinnell*, 495 F.2d at 462. As has been shown above, numerous factors well beyond the silence of class members bespeak the fairness of the proposed settlement. The Court must conclude then, that the proposed agreement meets the approval of an extremely high percentage of those under its aegis.

In spite of the obvious support for the proposed settlement, the Court has carefully considered the comments and opinions of class members who stand in opposition. It is useful to note, however, that numerous class action settlements have been approved with significantly more opposition than is presented here. *See Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3rd Cir.) *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974) (settlement fair, reasonable and adequate despite objection by over twenty percent of the class members); *Cotton v. Hinton*, 559 F.2d 1326 (5th Cir.1977) (settlement approved over objections of counsel purporting to represent almost fifty percent of the class members); *Parker v. Anderson*, 667 F.2d 1204 (5th Cir.) *cert. denied*, 459 U.S. 878, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982) (settlement approved despite objections from ten of the eleven named plaintiffs); *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir.1983) (settlement approved despite objections from twenty-three of the twenty-seven named plaintiffs and nearly forty percent of the class); *Boyd v. Bechtel Corp.*, 485 F.Supp. 610 (N.D.Cal.1979) (settlement approved despite objection from approximately sixteen percent of the class including three of the four named plaintiffs); *Elliot v. Sperry Rand Corp.*, 29 FEP 754 (D.Minn.1981), *aff'd* in part and *rev'd* in part on other grounds, 680 F.2d 1225 (8th Cir.1982) (settlement approved despite objection from named plaintiffs and

approximately twenty percent of the class). The existence of objecting class members is relevant, though, when considering the merits of a proposed settlement, despite the fact that it can be fair even when a large number object. *Armstrong,* 616 F.2d at 326; *Cotton,* 559 F.2d at 1331; *Pettway,* 576 F.2d at 1215; *Reed,* 703 F.2d at 174. Here, the objections of class members focus on their perceptions of the adequacy of the monetary relief, and their concern for the legitimacy of the job relief. Those issues have been addressed in Section II. A. above.

The Court wishes to note that it found the opinions of objecting class members to be thoughtful and it respects the courage and sincerity of class members who came forward. At the same time, the Court recognizes that the objecting class members were in a less than ideal position from which to assess the merits of the proposed settlement. They were not directly involved in this litigation. Although their lack of knowledge of the case's proceedings is not dispositive, the Court has considered it in the assessment of their objections.

■■■ In addition to the class members, five named plaintiffs noted their opposition to the proposed settlement. They are in a better position to assess the merits of the proposed agreement because they have been intimately involved with this case. Although the Court has carefully considered their objections, their opposition cannot block approval of the proposed settlement. *Manual for Complex Litigation,* Second, 30.43; *Parker,* 667 F.2d at 1211; *Pettway,* 576 F.2d at 1216.

Margaret Holden, the lead named plaintiff, voiced her approval of the proposed agreement. She spearheaded this litigation and was present in trial on a daily basis. Her approval carries great weight with this Court.

The Court concludes, after considering both the number of objections to the proposed settlement and the content of those objections, *see Reed,* 703 F.2d at 175, that the proposed agreement constitutes a fair, reasonable, and adequate resolution of the matters between the parties.

## C. The Complexity, Expense, and Likely Duration of Further Litigation

■■■ The complexity, expense, and likely duration of further litigation are factors which must be considered when evaluating the merits of a proposed settlement. *Grunin,* 513 F.2d at 124; *In re Flight Transportation,* 730 F.2d at 1135; *Bennett,* 737 F.2d at 986. These factors clearly favor the proposed settlement in this case.

It is common knowledge that Title VII class action suits have a well deserved reputation as being most complex. *See Cotton,* 559 F.2d at 1331. And this case is no exception. Throughout the proceedings the Court has been the recipient of numerous motions for summary judgment, plus additional other motions including those to reconsider prior denials of summary judgment, and to re- or de-certify the class. These motions came fast and furious, and often dealt with difficult and unique legal issues. If this cause continued, complex legal issues would surely be frequently presented, requiring further expenditure of both attorney time and client funds. The complexity of this case then, urges that the proposed settlement be approved.

The likely duration of this case also indicates that the proposed settlement should be approved. "The track record for large class action employment discrimination cases demonstrates that many years may be consumed by trial(s) and appeal(s) before the dust finally settles." *Officers,* 688 F.2d at 629; *see also Cotton,* 559 F.2d at 1331. This case more than illustrates the point. Instituted in 1981, it has already consumed six years of litigation with no immediate end in sight. Although some twenty weeks of Court time has been expended on the class certification hearing and plaintiffs' affirmative case, less than half of the trial has been completed. Both the railroad and the unions have their affirmative cases to present and plaintiffs are entitled to rebuttal. Considering that trial of this case has seen, thus far, no fewer than six to ten attorneys present per day, the costs for attorney trial time alone, notwithstanding preparation time, would be astronomical if this case were to continue.

And the string would not end here. If the class prevailed, a remedial phase would be required. This later phase would litigate each class member's entitlement to damages.[19] Since the class as certified consists of upwards of 7,800 people, the Court concludes that the number of remedial phase hearings required would be vast. These hearings would consume years of Court and lawyer time and would deny entitled claimants speedy relief.

In addition, it is a certainty that regardless of the outcome of this case if tried to a verdict, one party, if not all, would appeal to the Eighth Circuit and likely to the Supreme Court. Such appeals, in turn, could lead to remand proceedings, including a possible new trial and further appeals. Each of these proceedings would have to be resolved before the plaintiff class could be awarded any affirmative relief and such proceedings, in addition to creating additional costs, may take years. This delay is a substantial factor in favor of the proposed settlement. If the plaintiff class were to wait years before realizing any affirmative relief, it would lose many of the immediate benefits provided for in the proposed settlement. *Officers*, 688 F.2d at 629.

In spite of this concern, the Court recognizes that it must resist any temptation to approve an inadequate settlement simply to conclude a complex, expensive and lengthy suit. *See Armstrong*, 616 F.2d at 327. The Court cannot and will not "substitute one hour of efficiency for one moment of justice." *Pettway*, 576 F.2d at 1223 quoting *J.H. Rutter Rex Manufacturing Co., Inc., v. N.L.R.B.*, 473 F.2d 223, 243 (5th Cir.1973); *see also Armstrong*, 616 F.2d at 327. The Court is convinced, however, that when balancing the complexity, expense, and likely duration of further litigation in this case, along with the other factors bearing upon approval, the present relief afforded the plaintiffs weighs heavily in favor of the proposed agreement.

### D. The Extent of Discovery Completed and the Stage of the Proceedings

An additional factor to consider in determining a proposed settlement's fairness, adequacy, and reasonableness is the amount of discovery completed and the stage of the proceedings reached when the proposed settlement occurred. *Reed*, 703 F.2d at 172. These factors are important because they suggest the District Court's and counsels' ability to evaluate the merits of plaintiffs' claims. *Armstrong*, 616 F.2d at 325. With an accurate evaluation of plaintiffs' claims, both the Court and counsel are able to determine whether the amounts offered in settlement are appropriate.

As was noted earlier, the proposed settlement in this case was reached shortly after defendants began their case-in-chief. Prior to that time, plaintiffs had presented their affirmative case and defendants had cross-examined plaintiffs' witnesses. A seven week class certification hearing had been held, hundreds and hundreds of documents had been produced and scores of depositions had been taken.

It is clear that by the time the proposed settlement was reached, each party was keenly aware of the strengths and weaknesses of its case and was well able to accurately assess the benefits of the proposed settlement in light of the risk, expense, and delay associated with continued litigation. In addition, because of the Court's thirteen week exposure to this case by the time the proposed settlement was reached, it too was in a position to make a valid assessment of the strengths and weaknesses of plaintiffs' case and the merits of the proposed agreement. This knowledge of the case and the concomitant

---

**19.** The Court recognizes that under the proposed settlement, some claimants may have to go through individual hearings also. These hearings are only to determine who is entitled to rightful place seniority, they are not required to determine who is entitled to jobs, fallback seniority, or monetary relief. In light of this, the Court finds that the number of hearings required under the proposed agreement does not begin to approach the number required at the remedial phase of this case, if it were to be resolved in plaintiffs' favor. The Court does not contemplate that the unions or a claimant will frequently challenge BN's determination of entitlement to rightful place seniority. (See Section II. A. 2. b. (2) (b) above.)

ability to evaluate each side's merits, is a strong argument for settlement approval.

#### E. The Evidence, if any, that the Proposed Settlement is the Product of Fraud or Collusion

In reviewing the merits of a proposed settlement agreement, the Court must determine whether it is the product of fraud or collusion among the negotiating attorneys. *Armstrong,* 616 F.2d at 314; *Cotton,* 559 F.2d at 1330; *Reed,* 703 F.2d at 172. To do so, the Court must carefully scrutinize the conduct of negotiations leading to the proposed agreement. *In re General Motors,* 594 F.2d at 1124. A potential for conflict is inherent in the settlement process. "The interests of lawyer and class may diverge ... and certain interests may be wrongfully compromised, betrayed or 'sold out.'" *Pettway,* 576 F.2d at 1169. "[C]lass counsel may be persuaded by the prospect of a substantial fee to accept a settlement proposal which leaves the class with less relief than could have been procured through more vigorous negotiation." *Armstrong,* 616 F.2d at 313.

The taint of fraud or collusion among the attorneys who negotiate a proposed settlement may render unacceptable a seemingly fair, reasonable, and adequate settlement proposal. In this case Davis, Barnhill and counsel for the EEOC allege that fraud and collusion pervaded the negotiations leading to the proposed agreement. They accuse Paul Sprenger, lead and negotiating counsel for the class, of duplicity and fast dealing during the settlement process. They claim his conduct shows a lack of fidelity to the plaintiffs and a conflict of interest. As evidence of lead counsel's bad faith, objecting counsel assert that:

1) he resolved cases other than *Holden* concurrently with *Holden;*

2) he simultaneously negotiated class relief and attorneys' fees;

3) the proposed agreement was reached without their consent;

4) the monetary relief to the class decreased as the negotiation process continued; and

5) the proposed agreement does not provide a favorable fee award to Davis, Barnhill.

Prior to analyzing these assertions, the Court states first, that it took no part in negotiating the proposed settlement, other than at the 11th hour, and 59th minute before the agreement-in-principle was reached. At that time, the Court mediated a disagreement regarding the date upon which one aspect of the job-related relief outlined in the proposed agreement would end. In all other regards, the Court took no part in the negotiation of the proposed settlement.

During the negotiation process, the Court specifically rejected various counsels' offers to disclose how any party stood from a dollar standpoint or otherwise, and also overcame any temptation to intervene in the settlement process to "move things along." This was done to assure the Court's objectivity when reviewing the proposed settlement or when ruling on the merits, in the event settlement proved impossible.

Second, objecting counsel suggest that the Court was unwilling to hear their allegations of fraud and duplicity in the negotiation process. While it is true the Court did not relish hearing their allegations of bad faith (especially since those allegations were accompanied by personal invective and vituperation which the Court attributes to an unfortunate excess of zeal), it is not true that the Court closed its ears to the objectors' allegations. To the contrary, the Court heard little, other than objecting counsels' allegations of duplicity from July, 1986, when the briefs on preliminary approval of the proposed settlement were received, through October, 1986, when the postfairness hearing briefs were received. Throughout that time the Court was not only flooded with paper outlining purported bad faith, it also heard arguments and objecting counsels' witnesses at both the preliminary approval and the fairness hearings, attesting to fraud and collusion.

In addition, in light of objecting counsels' allegations, going as they do to the heart of the fairness, reasonableness, and adequacy of the proposed settlement, the Court heeded the guidance of the Seventh Circuit in *In re General Motors Corp. Engine Inter-*

*change Lit.,* 594 F.2d 1106 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), and permitted discovery into the negotiation process. *See also Parker,* 667 F.2d at 1208. The Court did so as an exercise of its supervisory authority under Rule 23 of the Federal Rules of Civil Procedure. During the course of discovery, depositions were taken of lead counsel for the plaintiff class, negotiating counsel for the railroad, and objecting counsel. In addition, documents and records were produced.

Discovery was permitted in order to give objecting counsel every opportunity to reveal that "smoking gun" which would show that fraud and collusion had pervaded the settlement negotiations. The discovery process revealed, however, that the explosive bang of the smoking gun was, in reality, only "the pale puff of a wet firecracker." J. Lawrence & R. Lee, *Inherit the Wind* 103 (1955). Nothing of use was produced as a result of discovery, other than a further exacerbation of a difficult situation. No benefit was received by the plaintiff class. There was, and the Court has seen, no evidence of fraud or collusion. Throughout the negotiation process, (as with any negotiation process), some relief increased while other relief decreased. This evidences the negotiation of a proposed settlement, it shows nothing else.

### 1. The Resolution of Cases Other than *Holden* Concurrently with *Holden*

■ During the negotiation process leading to the resolution of *Holden,* negotiating counsel resolved six cases in addition to *Holden.*[20] Four of the cases were race, sex or national origin discrimination actions either brought by or about to be brought by the Sprenger firm against BN. They included: *Rydzeski v. Burlington Northern, Inc.; Shoffner v. Burlington North-*

ern *Railroad Company; Bartlette v. Burlington Northern, Inc.;* and *Gulati v. Burlington Northern, Inc.* The four were settled for a total of $75,000.

Negotiating counsel also settled, concurrently with *Holden,* the attorneys' fees and costs aspects of *In Re Burlington Northern, Emp. Practices Lit., (MDL 374)* applicable to the Sprenger firm. *MDL 374* was a multi-district race discrimination action against BN and its unions brought in the Northern District of Illinois. It was comprised of individual, class action, and intervenor complaints. Lead counsel for the plaintiffs in *MDL 374* were the Sprenger firm and Davis, Barnhill.

*MDL 374* exemplifies the never-ending aspects of complex class action litigation: it was purportedly settled, by consent decree, on November 7, 1983, the first day of trial. Pursuant to the decree, BN agreed to provide monetary and injunctive relief to the class. In addition, BN agreed to pay the costs and reasonable attorneys' fees of the EEOC and all lawyers for the plaintiffs. The amounts to be paid as costs and attorneys' fees were not, however, set forth in the consent decree.

BN and lead counsel for the plaintiffs were unable to agree on an amount for lead counsels' attorneys' fees. As a result, lead counsel petitioned the Court for a determination of that amount. The Honorable George N. Leighton, in *E.E.O.C. v. Burlington Northern Inc.,* 618 F.Supp 1046 (N.D.Ill.1985) concluded that lead counsel were entitled to the lodestar amount[21] they requested, plus interest on that amount from the date of the order entered in accordance with the above opinion. *Id.* at 1055. Judge Leighton concluded, however, that lead counsel were not entitled to have their lodestar amount adjusted upward by a multiplier.[22] *Id* at 1064.

---

**20.** As part of the *Holden* settlement, the Sprenger firm agreed to dismiss, with prejudice, its appeal from this Court's February 3, 1986, and April 22, 1986, rejection of the revised consent decree entered into between the plaintiffs and the defendant unions. *See* Section I.C. above.

**21.** The product of the number of hours reasonably worked multiplied by the reasonable hourly rate is known as the lodestar amount. *Ohio-*

*Sealy Mattress Mfg. Co. v. Sealy Inc.,* 776 F.2d 646, 651 (7th Cir.1985).

**22.** In some special circumstances a lodestar amount may be adjusted upward by a multiplier. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); *Ohio-Sealy Mattress,* 776 F.2d at 651.

Judge Leighton's decision on the multiplier issue was appealed to the Seventh Circuit Court of Appeals. The Seventh Circuit's decision was pending when the proposed settlement in *Holden* was reached. In an ironic twist of fate, the Seventh Circuit rendered its decision on the multiplier issue during the fairness hearing in *Holden*. In *In re Burlington Northern, Emp. Practices Lit.*, 810 F.2d 601, 608 (7th Cir.1986), the Seventh Circuit concluded that lead counsel were not entitled to a multiplier of their lodestar amount and affirmed the District Court's decision in that regard.

Prior to the issuance of the Seventh Circuit's decision, negotiating counsel settled, concurrently with the proposed settlement in *Holden*, *MDL 374*'s multiplier issue as it related to the Sprenger firm. Pursuant to that proposed agreement, the Sprenger firm was granted a 1.5 multiplier of its lodestar amount. The proposed agreement on the multiplier issue was to be valid and enforceable notwithstanding any decision of the Seventh Circuit. Therefore, though the Seventh Circuit's decision in *In re Burlington Northern, Emp. Practices Lit.*, is of interest, it has no effect on the attorneys' fees to be awarded the Sprenger firm for *MDL 374*.

In addition to resolving the multiplier issue as part of the proposed settlement in *MDL 374*, BN agreed to pay the Sprenger firm $600,000 upon execution of the *Holden* settlement. This $600,000 represented the uncontested portion of the Sprenger firm's pending fee and cost applications in *MDL 374*.[23] BN also agreed to pay the reasonable fees and costs of the Sprenger firm in any action brought to enforce the *MDL 374* consent decree. The proposed settlement obligates BN to pay those fees and costs only if the Sprenger firm prevails in any such action and only to the extent fees and costs are awarded by the Court or agreed to by the parties.

The final case settled concurrently with *Holden* was *Black Media, Inc. v. E.C. Forbes d/b/a Forbes Marketing Associates, Burlington Northern Railroad Co.*

*and Sprenger, Olson & Shutes, P.A..* This case involved the payment for the printing of the class notices in *MDL 374*. The proposed settlement in that case provided that BN would defend the Sprenger firm against Black Media and obligated the Sprenger firm to cooperate in the defense.

The objectors contend the resolution of matters other than *Holden*, along with *Holden*, evidences a conflict of interest. They contend that by resolving matters other than *Holden*, amounts that would have been available to the *Holden* class were given to others. Before addressing these contentions, it must be pointed out and emphasized that during the *Holden* settlement process, everyone was aware that matters other than *Holden* were being discussed with an eye toward resolution. Lead counsel for the plaintiffs knew it, negotiating counsel for the railroad knew it, union counsel knew it and objecting counsel knew it. It was disclosed to all counsel and the Court early on and was given the Court's approval. It was also disclosed to the class members in the mailed notice sent to them regarding the proposed agreement. The notice identified, by name, the cases settled concurrently with *Holden*. The Court received no objection from anyone during the negotiation process regarding this settlement strategy. Objecting counsels' dissatisfaction with it now, in the last analysis, is a make-weight argument, and the objectors recognize it as such.

The Court finds no necessary conflict in resolving matters other than *Holden* concurrently with *Holden*. Early on in the negotiation process the Court recognized that any settlement of *Holden*, if one could be attained, would have had to include a global settlement of all matters involving the Sprenger firm and BN. The Sprenger firm has been at war with BN regarding its employment practices since 1978, when it filed its first discrimination suit against the railroad company. The parties have been at each other's throats, almost literally, for

---

**23.** All counsel agreed that this sum had been earned and was due and owing from BN to the Sprenger firm. It had been withheld, however, because BN was using it as a bargaining chip in the contest over the multiplier issue in *MDL 374*.

approximately ten years.[24] With this reality in mind, the Court recognized that a proposed settlement consisting of anything less than a settlement of all matters involving the Sprenger firm and BN, could never have been accomplished.

During the settlement process leading to the resolution of *Holden,* the railroad company made clear that enough was enough. It wanted the Sprenger firm "off the property" and indicated that it was willing to give more relief to the *Holden* class if it could resolve all matters pertaining to it in which the Sprenger firm was involved. The Court did not then, and does not now, find BN's position unreasonable, in light of the history between the parties outlined above.

It is apparent to the Court that by negotiating to resolution matters other than *Holden* during the *Holden* settlement process, the *Holden* class received greater relief than if *Holden* had been resolved alone. The railroad company paid dearly for the "off the property" relief it sought. The resolution of other matters, instead of being deleterious to the *Holden* class as the objectors contend, appears to have benefited the class. The Court concludes that resolving matters other than *Holden,* when there was full disclosure that such resolutions were occurring, does not reveal an inherent conflict of interest nor does it evidence fraud or collusion on lead counsel's part in the settlement process.

### 2. The Simultaneous Negotiation of Class Relief and Attorneys' Fees

■ As further evidence of fraud and collusion on lead counsel's part, the objectors point to the fact that he simultaneously negotiated class relief and attorneys' fees. They contend those issues should have been resolved separately in order to avoid a conflict of interest. Prior to and during trial, the Court rejected this view. The Court does so again.

The Court is well aware that lead counsel negotiated class relief and attorneys' fees concurrently. In fact, early in the settlement process, all parties were aware of the simultaneous negotiation of class relief and fees. Soon after settlement discussions began, the parties informed the Court that they had reached an impasse; lead counsel refused to negotiate attorneys' fees while he was negotiating class relief. This was unacceptable to the railroad.

The parties sought the Court's guidance on the matter. Plaintiffs moved the Court for an order requiring that settlement negotiations be conducted in a fashion whereby class relief be negotiated prior to and apart from the negotiation of attorneys' fees, pursuant to the rule expounded in *Prandini v. National Tea Co.,* 557 F.2d 1015, 1021 (3rd Cir.1977); *see also Mendoza,* 623 F.2d at 1352–1353. The Court, by order of January 16, 1986, declined to adopt this rule. Subsequently, the Supreme Court in *Evans v. Jeff D.,* 475 U.S. 717, 106 S.Ct. 1531, 1540–1543, 89 L.Ed.2d 747 (1986) rejected the *Prandini* rule, and authorized the simultaneous negotiation of class relief and attorneys' fees.

The Court recognized that defendants' past dealings with lead counsel led them to believe that absent simultaneous negotiation of class relief and fees, the fee issue would remain to haunt them. In this regard, the past was a certain guide—the merits of the *MDL 374* suit were resolved on November 7, 1983; the fee issue in that case was not judicially resolved until October 2, 1986, when the Seventh Circuit rendered its *In re Burlington Northern, Emp. Practices Lit.,* decision. With the *MDL 374* suit clearly in mind, defendants had a justifiable fear that resolution of the merits of *Holden* without resolution of the attorneys' fee issue would constitute no resolution at all.

The Court also concluded that defendants had a legitimate right to know their

---

**24.** Throughout that time period, the interactions between the Sprenger firm and Burlington Northern have resembled the Frazier-Ali "Thrilla in Manilla" championship fight of October 1, 1975. The Sprenger firm and BN were two champions, each respecting the other, each hit by and hitting with heavy blows, each exhausting the other, and each giving and getting the best the other had to offer.

entire dollar exposure before agreeing to any terms of the proposed settlement. Absent such knowledge, the cost of the proposed settlement to the defendants may well have exceeded their perceived cost of resolving this case on the merits. *See Jeff D.,* 106 S.Ct. at 1541. As noted by the Supreme Court in *Jeff D.:*

> The adverse impact of removing attorney's fees and costs from bargaining might be tolerable if the uncertainty introduced into settlement negotiations were [sic] small. But it is not. The defendants' potential liability for fees in this kind of litigation can be as significant as, and sometimes even more significant than, their potential liability on the merits..... [This] potential liability for attorney's fees may overshadow the potential cost of relief on the merits and darken prospects for settlement if fees cannot be negotiated.

*Jeff D.,* 106 S.Ct. at 1541–1542. The Court cannot fault defendants for their insistance that class relief and attorneys' fees be negotiated simultaneously.

In light of the above, the Court finds the simultaneous negotiation of class relief and fees to have been conducive to settlement, to have been in the public interest, and to have served the interests of the parties. *See Jeff D.,* 106 S.Ct. at 1543 n. 30. Therefore, this Court will not conclude that such negotiation was inappropriate.

3. The Proposed Agreement was Reached Without the Consent of Davis, Barnhill or the EEOC

 As further evidence of fraud and collusion on lead counsel's part, the objectors point to the fact that the proposed agreement was reached without their consent or approval. The Court recognizes that lead counsel's inability to obtain the concurrence of all counsel or the EEOC before agreeing to the proposed settlement's terms is a matter to be considered. But it is not dispositive. In this case, the Court does not find, after careful consideration, that lead counsel's failure to obtain the objectors' consent is evidence of bad faith on his part.

As negotiations proceeded in this case, it was obvious to all that no complex settlement could ever be reached in a room full of approximately fifteen lawyers, each representing a separate party or interest. It was agreed by all counsel that both the plaintiff class and the railroad would use a single negotiating counsel; union counsel would enter the negotiation process only if discussions between plaintiffs' counsel and railroad counsel proceeded to a point at which union counsel could productively participate. The objectors acknowledge that lead counsel kept them apprised of the progress made during these negotiations but now claim he failed to inform them regarding details of the negotiations late in the process and failed to get their approval of the proposed settlement prior to consenting to its terms.

The Court recognizes that the EEOC's lack of concurrence must be accorded a certain deference because of its expertise in the area of discrimination and because it represents the views of the Republic as a whole. Its lack of consent must be tempered, however, by determining what assistance, if any, it has rendered in this cause. With that consideration in mind, the Court believes that lead counsel may, in fact, have advanced the interests of the class by not seeking or waiting for the EEOC's ratification of the proposed settlement prior to agreeing to its terms.

The Court regrets to state, but in fairness must point out, that during this action, the EEOC's cumbersome bureaucracy has clanked, clattered and wheezed. Throughout the proceedings prior to and during trial, any schedule, stipulation or trial compromise was delayed, jeopardized or halted by the EEOC's nit-picking concern for irrelevant detail—or perhaps by its own internal inertia as exemplified by its dilatory conduct in issuing right-to-sue letters to members of this class.

The EEOC's delay in issuing right-to-sue letters has had a detrimental effect on the plaintiff class. Diane Kubes, who sought to be a class representative, filed a promotion discrimination claim against BN with the EEOC in 1973. Likewise, Karla Keefe, who also sought to be a class representative, filed a hiring discrimination

claim against BN with the EEOC in 1974. It is incredible, but true, that neither were issued right-to-sue letters until 1984, at least ten years after filing their claims.[25] Because of the EEOC's dereliction of duty in issuing right-to-sue letters, Judge Magnuson was prevented from certifying a hiring class or a class that would have included members with claims prior to July 28, 1977.[26, 27]

In addition, the EEOC's bureaucracy has proved to be a detriment to any valid compromise of this case. The attorneys for the EEOC were unable, through no fault of their own, to act without prior approval from the EEOC's Washington office. The upshot of this policy was that the EEOC's involvement in the fluid and fast-moving, real-life negotiating sessions which occurred in this case became impossible. First, the EEOC could not make up its mind (without Washington authority, the EEOC negotiator could not make a commitment). Second, the EEOC had to get what it wanted (because what it wanted was in the "public interest", and it could not, of course, agree to something not in the public interest).[28] Third, it could not agree piecemeal. The entire agreement had to be submitted for its review before any one issue could be resolved (which just does not happen in the real world).

Because of the EEOC's internal modeling of its own role, there was a pernicious sense in which it simply could not negotiate in this case. It waited to see the product of negotiations before declaring it among the quick or the dead. In light of the EEOC's conduct, the Court cannot find that lead counsel did the class any injustice by failing to seek the EEOC's wisdom before agreeing to settle this case.

Even if the EEOC's conduct in this case had been exemplary, the Court can not conclude that lead counsel's failure to seek its approval, or the approval of Davis, Barnhill, prior to settlement, shows bad faith. He had no duty to seek their approval. Neither the EEOC nor Davis, Barnhill represent the class as a whole or any individual class member.[29] The EEOC was permitted to enter this cause, not as an independent party, but as an intervenor only. Its interest was defined by the interest of the plaintiff class and the scope of its appearance was limited to that of the class. *See* April 10, 1984, order of the Honorable Floyd E. Boline. Davis, Barnhill entered this cause in June, 1984, three years after this litigation commenced. It acted solely as assisting counsel to the Sprenger firm. In light of their roles in

---

**25.** The Supreme Court in *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 1508, 84 L.Ed.2d 518 (1985) recently noted the EEOC's dilatory conduct in acting upon a charge of discrimination filed with its Charlotte District Office. The Court noted parenthetically that the EEOC's District Director did not find there was reasonable cause to believe that the plaintiff's charges of discrimination were true until five years after she had filed those charges.

**26.** See March 5, 1985 order of the Honorable Paul A. Magnuson.

**27.** The EEOC's tardiness in issuing right-to-sue letters has acted as a detriment to other plaintiffs in addition to the *Holden* class. In the Eighth Circuit's recent decision in *Whitfield v. Anheuser-Busch, Inc.*, 820 F.2d 243 (8th Cir. 1987), the Court noted that the EEOC had delayed in issuing the plaintiff a right-to-sue letter for over ten years. *Id.* at 244. As a result, the Court concluded that the plaintiff's claim of race discrimination was barred by the doctrine of laches. *Id.* at 245–46.

**28.** The syllogism is as follows:
 a) the EEOC represents the public interest;
 b) anything with which the EEOC disagrees is not in the public interest; and
 c) the EEOC has not agreed to the proposed settlement, therefore, it is not in the public interest.

The Court is not swayed by this logic, especially in light of the EEOC's conduct in this case. The EEOC reminds the Court of the Lord Chancellor in Gilbert & Sullivan's *Iolanthe* who stated that:
 The Law is the true embodiment
 of everything that's excellent.
 It has no kind of fault or flaw,
 And I, my Lords, embody the Law.
W. Gilbert & A. Sullivan, *Iolanthe* 56 (B. Treharne ed. 1822)

**29.** Although the mailed and published notices informed class members of the objectors' dissent and provided the objectors' telephone numbers cost free, no class member sought the objectors' representation at the fairness hearing.

this litigation, it is clear to the Court that just as their disapproval of the proposed settlement cannot block its approval, *See Local Number 93*, 106 S.Ct. at 3079; neither can lead counsel's failure to obtain their approval prior to settlement.

The Court must also note that if the proposed settlement was contingent on the objectors' assent to its terms, no settlement would have been obtained. The objectors' memoranda and arguments in opposition to the proposed settlement have etched in the Court's mind one crystal clear notion—the objectors have unrealistically assessed plaintiffs' case. In short, it is obvious to the Court that by using their assessment of plaintiffs' case as their base, the objectors were willing to jeopardize everything and could well have received precious little in return. Lead counsel's failure to engage in such a gamble does not indicate he "sold out" the class.

4. The Monetary Relief to the Class Decreased as the Negotiation Process Continued

■■ At the fairness hearing in this case, the objectors revealed that in April, 1986, BN offered $2.26 million to the class but pointed out that the proposed settlement agreement gives plaintiffs only $2.04 million. The objectors further disclosed that while the sums offered to the class decreased, the sums offered to lead counsel for attorneys' fees increased. These facts were proffered as the "smoking gun" evidencing lead counsel's lack of fidelity to the class. But this smoking gun exploded not with a bang but a whimper: the objectors' revelations did not disclose all of the details surrounding the monetary offerings.

The sum of $2.26 million, when offered, included no nonmonetary relief whatsoever; it made no provision for jobs, rightful place seniority, fallback seniority, nor any other aspect of the job relief set forth in the present proposed agreement. The sum of $2.04 million, which plaintiffs are to receive under the proposed settlement agreement, reflects BN's assent to grant class members job relief. It is clear that the ten percent reduction in monetary relief to the class over the course of negotiations

was a "trade-off" of dollars for jobs. This reduction of cash in exchange for major job relief is the stuff of which negotiated settlements are made.

The objectors' suggestion that the proposed settlement's provision of up to 1150 jobs is of no consequence—and represents the class' capitulation—raises questions as to whether it is the objectors who are being disingenuous in their representations. While objecting counsel may have concerns regarding the job relief or the assurance of its provision, the trade-off of dollars for jobs was, in general, if not in specific, known to them.

The Court believes that the proposed settlement's addition of forward-going, non-financial relief cannot be blithely tossed away. The Court concludes that the reduction of monetary relief to the class in exchange for substantial job relief in no regard shows lead counsel sold out the plaintiff class. Rather, it shows that he negotiated a well-rounded settlement to provide plaintiffs with global relief.

5. The Proposed Agreement Does Not Provide a Favorable Fee Award to Davis, Barnhill.

As the final indicia of fraud and collusion, the objectors complain that under the proposed settlement in *Holden*, BN is free to object to Davis, Barnhill's petition for fees, while it will not make such objection to the Sprenger firm's petition. In addition, they complain that the resolution of the multiplier issue in the settlement proposed in *MDL 374* is inapplicable to them. In light of the Seventh Circuit's decision in *In re Burlington Northern, Emp. Practices Lit.*, 810 F.2d 601 (7th Cir.1986), Davis, Barnhill will not receive a multiplier, whereas pursuant to the proposed *MDL 374* settlement, the Sprenger firm will receive a multiplier of 1.5.

The objectors' allegations of fraud and collusion regarding the proposed fee agreements in *Holden* and *MDL 374* must be seen for what they are; —the objectors do not like the proposed agreements, and in particular, they do not care for the implications those agreements have for them-

selves. It cannot come as a great shock to the objectors, however, that agreements, which they have fought against tooth and nail, are not particularly beneficial to them. But their dissatisfaction with the proposed agreements does not make them fraudulent or collusive.

The sad fact is, there is no conceivable way in which counsel who crafted the proposed settlements at issue could have crafted attorneys' fee clauses pleasing to the objectors. The objectors have leveled challenges at negotiating counsel which have unfortunately gone well beyond a reasoned disagreement concerning the merits of the proposed settlements. Objectors proper concern for the class has unfortunately turned into an unbecoming personal invective. Objecting counsel have been obstreperous, as well as professionally insulting to their colleagues. They have leveled vicious and wholly unwarranted attacks upon their opposition. These assaults have neither enlightened the Court nor enobled those who have made them.

Suffice it to say that in the same sense as the *Holden* settlement cannot bind those who have opted out of the class, so too, the proposed fee agreements of negotiating counsel in *Holden* and *MDL 374* cannot dispose of the objectors fee claims. The fact that they do not do so bespeaks rationality, not dereliction of duty. The inclusion of clauses in the proposed settlement agreements favorably providing for the fees of Davis, Barnhill, would be nothing more than payment by negotiating counsel for a stick with which the objectors may beat them. Neither Rule 23, nor rationality requires such a step. Objecting counsels' displeasure with the proposed fee provisions in the *Holden* and *MDL 374* agreements does not indicate that those agreements are unfair, unreasonable or inadequate nor does it indicate that they are the product of fraud or collusion.

### III. *Conclusion*

The Court has considered this complex and challenging case at length. In assessing the proposed settlement agreement, the Court has, in the end, attempted to strike a subtle balance between the certainty of the relief provided in that agreement and the risk to the parties in proceeding to a trial-to-verdict. No settlement proposal, and indeed no judgment, is perfect, but the Court is convinced that the proposed settlement agreement in this cause is a full, fair, reasonable, and adequate resolution of the matters at issue between the parties.

For the reasons set forth above, IT IS ORDERED that:

The proposed settlement be, and hereby is, approved. LET JUDGMENT BE ENTERED ACCORDINGLY.